Sonjay C. Singh (*pro hac vice*)
**SIRI & GLIMSTAD LLP**
400 East Pratt Street
8th Floor - #16946751
Baltimore, MD 21202
Tel: (212) 532-1091
Email: ssingh@sirillp.com

Daniel Srourian, Esq. (SBN 285678)
SROURIAN LAW FIRM, P.C.
468 N. Camden Dr. Suite 200
Beverly Hills, CA 90210
Telephone: (213) 474-3800
Facsimile: (213) 471-4160
Email: daniel@slfla.com

*Attorneys for Plaintiffs, Minor Plaintiffs, and the Putative Class*

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**
**CIVIL DIVISION**

| | |
|---|---|
| **RAQUEL DIAZ**, on behalf of her minor child, **B.E.**, and all others similarly situated, **LISA MEDINA**, on behalf of her minor child, **G.C.**, and all others similarly situated, **OSCAR RODRIGUEZ**, on behalf of his minor child, **F.R.**, and all others similarly situated, **STACY RADER**, on behalf of her minor child, **S.C.**, and **KATRINA MONTGOMERY**, on behalf of her minor children, **J.M.**, **J.A.**, and **J.M.**, and all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>**PARAMOUNT SKYDANCE CORPORATION** and **PLUTO INC.**,<br><br>Defendants. | Case No. 5:25-cv-02945-KK (DTBx)<br><br>Honorable Kenly Kiya Kato<br><br>**JURY TRIAL DEMANDED** |

# AMENDED CLASS ACTION COMPLAINT

Plaintiffs Raquel Diaz, Lisa Medina, Oscar Rodriguez, Stacy Rader, and Katrina Montgomery on behalf of their minor children, B.E., G.C., F.R., S.C., J.M., J.A., and J.M. (the "**Plaintiffs' Children**"), and all similarly situated persons, allege the following against Defendants Paramount Skydance Corporation ("**Paramount**") and Pluto Inc. ("**Pluto**" and together with Paramount, **"Defendants"**), based upon personal knowledge with respect to themselves and their children, and on information and belief derived from, among other things, investigation by Plaintiffs' counsel and review of public documents as to all other matters:

## I. INTRODUCTION

### A. Children's Privacy in a Digital World

1. In today's digital world, children are consuming more online content than ever before.

2. Consumers want and expect websites catering to children to be especially careful to avoid sharing information about those children with advertisers, or at the very least, to be upfront with parents about the information they disclose so parents can decide whether the website is safe and appropriate for their children to use. Unfortunately, that is oftentimes not the case.

/ / /

/ / /

3. A study that scraped over 2,000 websites directed at children (the "**Moti Study**") found that over 90% of the websites had tracking technologies embedded thereon and were designed to collect user information.[1]

4. This unprecedented monitoring of children's online behavior has led some researchers to sound the alarm. As one study put it, children growing up in "datafied childhoods" today are at risk of cradle-to-grave monitoring that leads to the creation of "invasive profiles[2] that can identify . . . very sensitive and intimate parts of their lives."[3]

5. Protecting children's privacy is, thus, a major concern for parents in this interconnected age; indeed, parents cannot protect their children from cradle-to-grave monitoring unless they can limit "cradle" monitoring, and opting out of using technology is not a realistic option for most. In a recent survey, more than 85% of parents believe that access to technology is important for their children's future, but more than three

---

[1] Zahra Moti et al., *Targeted and Troublesome: Tracking and Advertising on Children's Websites*, *in* 45TH IEEE SYMPOSIUM ON SEC. & PRIV. (May 20-23, 2024), at 11, *available at:* https://www.researchgate.net/publication/377240886_Targeted_and_Troublesome_Tracking_and_Advertising_on_Children's_Websites.

[2] The online "profiling" of children concerns the "auto-mated processing of personal data which consists of applying a "profile" to a child, particularly in order to take decisions concerning the child or to analy[z] or predict his or her personal preferences, behavio[]r and attitudes." Eline L. Leijten & Simone van der Hof, *Dissecting the commercial profiling of children: A proposed taxonomy and assessment of the GDPR, UCPD, DSA and AI Act in light of the precautionary principle*, 57 COMPUTER L. & SEC. REC. 1, 2 (2025).

[3] *See* Eline L. Leijten & Simone van der Hof, *Dissecting the commercial profiling of children: A proposed taxonomy and assessment of the GDPR, UCPD, DSA and AI Act in light of the precautionary principle*, 57 COMPUTER L. & SEC. REC. 1, 3 (2025).

quarters of parents are concerned about protecting their family's security, and 73% were concerned about their children's personal data being collected by third parties, without their consent.[4]

6. These concerns are well founded. "[U]p until age 18, young people are highly vulnerable to advertising."[5] In the words of one researcher:

> There's a lot of neuroscience that explains why adolescents and children are so vulnerable [to advertising]…they're much more attuned to rewards, much less attentive to consequences and risks, much more tolerant of ambiguity, much more sensitive to social cues and much more impulsive, so they don't have a lot of cognitive control…***This is an advertiser's dream***.[6]

7. Many researchers have studied how advertisements affect children and have highlighted their potential negative impacts on children's development and well-being. These negative impacts have materialized because the advertising companies are, by and large, not responsible caretakers of the data they collect, and do not appropriately protect minors. In fact, a jury recently ordered Meta to pay $375 million in damages

---

[4] *POLLING MEMO: PARENTS' VIEWS ON CHILDREN'S DIGITAL PRIVACY AND SAFETY,* TRUSTED FUTURE, https://trustedfuture.org/childrens-digital-privacy-and-safety/#:~:text=87%25%20of%20parents%20believe%20technology,the%20lives%20of%20their%20parents (last visited Feb. 25, 2025).

[5] *Exposing the Dangers of Targeting Children as Consumers*, UC IRVINE PAUL MERAGE SCHOOL OF BUSINESS (July 3, 2024), https://merage.uci.edu/news/2024/07/Exposing-the-Dangers-of-Targeting-Children-as-Consumers.html (last visited Aug. 1, 2025).

[6] *Id*.

because its platforms contain inadequate safeguards to prevent sexual predators from contacting and exploiting minors.[7]

8. Moreover, many websites directed at children do not protect minor users from age-inappropriate ads. The Moti Study found that 36% of the websites studied contained one or more ads, 27% of which were targeted ads.[8] The Study further found that many of these ads featured age-inappropriate content, including, for example, ads about weight loss,[9] dating, and mental health, as well as ads featuring sexually suggestive imagery.[10]

9. In light of the growing awareness of the risks posed to children by online tracking and advertising, there have been calls to update the Children's Online Privacy

---

[7] *Meta Ordered to Pay $375 Million Over Child Safety Violations*, THE NEW TORK TIMES (March 24, 2026), available at https://www.nytimes.com/2026/03/24/technology/meta-new-mexico-child-safety-violations.html. The New Mexico Attorney General's investigation created a "fictitious [account for a] 14-year-old girl that received an offer of $180,000 to appear in a pornographic video." *Instagram and Facebook Subscriptions Get New Scrutiny in Child Safety Suit*, THE NEW TORK TIMES (Feb. 26, 2024), available at https://www.nytimes.com/2024/02/26/us/instagram-facebook-children-subscriptions-predators.html.

[8] Moti et al., *supra* note 1.

[9] Ads directed to minors about weight loss are especially concerning as they can contribute to psychological harms. A jury recently found that the social media giants created platforms which are addictive and harm minors, awarding a now 20-year-old woman $6 million for contributing to psychological harms including body dysmorphia and thoughts of self harm when she was a minor. *Meta and YouTube Found Negligent in Landmark Social Media Addiction Case*, THE NEW TORK TIMES (March 25, 2026), available at https://www.nytimes.com/2026/03/25/technology/social-media-trial-verdict.html.

[10] *Id.*

Protection Act ("**COPPA**") to completely "ban targeted advertising to children and teens."[11]

### B. Pluto TV and its Collection of Children's Data

10. Defendant Paramount is a multinational mass media company that provides network, studio, and streaming content to over 1-billion subscribers worldwide through its many well-known brands, including CBS, MTV, Comedy Central, Nickelodeon, Showtime, and Paramount Pictures.[12] Pluto is a Paramount subsidiary operating the Pluto TV video streaming service, which provides its users with access to over 700,000 hours of pre-recorded video content, including a wide-variety of child-friendly programming hosted in Pluto TV's specific "Kids" section (the "**Kids' Section**").[13] This content is accessed by viewers through Defendants' online video streaming platform, available by either visiting www.pluto.tv, or downloading one of Defendants' many mobile phone, tablet, and desktop applications (the "**Platform**").[14] To use the Platform through an application, users must first sign-up for a Pluto TV account.

---

[11] *Senators Markey and Cassidy Reintroduce COPPA 2.0, Bipartisan Legislation to Protect Online Privacy of Children and Teens*, SENATOR ED MARKEY (May 3, 2023), https://www.markey.senate.gov/news/press-releases/senators-markey-and-cassidy-reintroduce-coppa-20-bipartisan-legislation-to-protect-online-privacy-of-children-and-teens (last visited Apr. 29, 2026).

[12] *About*, PARAMOUNT, https://www.paramount.com/about (last visited Aug. 1, 2025); *Brands*, PARAMOUNT, https://www.paramount.com/brands (last visited Aug. 1, 2025).

[13] *Pluto TV*, PARAMOUNT, https://www.paramount.com/brands/pluto-tv (last visited Aug. 1, 2025).

[14] *See Where to Watch*, PLUTO TV, https://pluto.tv/where-to-watch (last visited Aug. 1, 2025).

11. Unbeknownst to children who use the Platform (and their parents), including Plaintiffs and their children, Defendants have chosen to harvest personally identifiable information on its child-directed video platform, including the specific videos watched by minors (the "**Private Children's Data**"), and contemporaneously shares that information with internet advertising giants, including Alphabet, Inc. ("**Google**") and Microsoft Corp. ("**Microsoft**").

12. Giants like Google and Microsoft compile Defendants' information as fuel for their targeted advertising enterprise. That data is then used to stream ads to Defendants' customers. When Google and Microsoft receive information about an individual's media preferences and educational attainment, they compile it into an ever-growing advertising profile specific to the individual which they use to stream tailored ads to that person's computers and smartphones based on the individual's demography, interests, goals, and anxieties.

13. One of the ways that Google and Microsoft gather this information is through offering web service operators a *quid pro quo*. Google and Microsoft offer web operators access to their proprietary suites of marketing, advertising, and customer analytics software, including Google Analytics, Google AdSense, Google Tag Manager, Microsoft Advertising, Big Ads, and Xandr (collectively, the "**Business Tools**"). Armed with these Business Tools, web service operators can leverage Google and Microsoft's enormous database of consumer information for the purposes of deploying targeted

advertisements, performing minute analyses of their customer bases, and identifying new market segments that may be exploited.

14. In exchange for access to these Business Tools, web service operators install Google and Microsoft's surveillance software on their website (the "**Tracking Tools**"), including 'tracking pixels' ("**Pixels**") and third-party 'cookies' that capture sensitive, personally identifiable information provided to the website operator by its website users. This sensitive information can include a unique identifier that Google and Microsoft use to identify that user, regardless of what computer or phone is used to access the website. The Tracking Tools can also capture and share other information like the specific webpages visited by a website user, items added to an online shopping cart by a website user, information entered into an online form by a website user, and the device characteristics of a website user's phone or computer.

15. In essence, when website operators use Google and Microsoft's Business Tools, they choose to participate in Google and Microsoft's mass surveillance network and, in turn, benefit from Google and Microsoft's collection of user data at the expense of their customers' privacy.

16. Defendants have chosen to prioritize their marketing efforts over consumer privacy by installing Google and Microsoft's Tracking Tools on its website, including in the Kids' Section.

/ / /

17. Each of the Plaintiffs' Children and Class Members visited the Platform and had their Private Children's Data tracked by Defendants using the Tracking Tools. However, Defendants ***never*** obtained authorization from Plaintiffs or Class Members to share the Private Children's Data they collect with third parties. At all times relevant to this action, Plaintiffs and Class Members gave no informed consent for the Private Children's Data to be transmitted to third parties, including two of the largest advertisers and compilers of user information in the world.

18. Moreover, Defendants' tracking of users violated numerous state and federal laws, including the Video Privacy Protection Act (**"VPPA"**), passed specifically to prevent the disclosure and aggregation of data relating to an individual's video consumption, and the Children's Online Privacy Protection Act of 1998 (**"COPPA"**), enacted to protect children, like Plaintiffs' Children, from being surveilled while using the Internet.

19. As a result of Defendants' conduct, Plaintiffs, Plaintiffs' Children, and Class Members have suffered numerous injuries, including: (i) invasion of privacy; (ii) lack of trust in communicating with online service providers; (iii) emotional distress and heightened concerns related to the release of the Private Children's Data to third parties, (iv) loss of benefit of the bargain; (v) diminution of value of the Private Children's Data; and (vi) statutory damages.

/ / /

20. Therefore, Plaintiffs seek, on behalf of Plaintiffs' Children and a class of similarly situated persons, to remedy these harms and assert the following statutory and common law claims against Paramount: violations of the Video Privacy Protection Act, 18 U.S.C. § 2710, *et seq*.; Invasion of Privacy; violations of the Electronic Communications Privacy Act, 18 U.S.C. § 2511(1), *et seq*.; violations of the California Invasion of Privacy Act, Cal. Pen. Code § 360, *et seq*.; Invasion of Privacy Under California's Constitution, Cal. Const. Art. 1, § 1; Negligence; Breach of Implied Contract; and Unjust Enrichment.

## II. PARTIES

***Plaintiff Raquel Diaz and Minor Plaintiff B.E.***

21. Plaintiff Diaz and Minor Plaintiff B.E. are citizens of the State of California, residing in San Bernardino County. Plaintiff Diaz brings this action on behalf of Minor Plaintiff B.E., and all others similarly situated.

22. In 2025, Minor Plaintiff B.E. utilized Defendants' Platform on the family's personal electronic devices to watch pre-recorded video content hosted in the Kids' Section of Defendants' Platform.

23. Plaintiff Diaz never authorized Defendants to disclose any aspect of Minor Plaintiff B.E.'s use of their platform to third parties, including the Private Children's Data that Minor Plaintiff B.E. provided to Defendants by using the Platform.

/ / /

24. On every occasion that she viewed child-directed video content on the Platform, Minor Plaintiff B.E. was under the age of thirteen, possessed accounts with Google and Microsoft, and accessed Defendants' Platform while logged into those Google and Microsoft accounts on the same device.

25. While Minor Plaintiff B.E. used the Platform, the Platform streamed ads to Minor Plaintiff B.E., including for toys and movies for purchase, which Minor Plaintiff B.E. subsequently requested Plaintiff Diaz to purchase.

26. Plaintiff Diaz also noticed age-inappropriate ads being shown to Plaintiff B.E. on the Platform, including ads with sexual content or depicting adult relationships, despite exclusively using the Kids' Section on the Platform.

27. The Platform also recommended age-inappropriate TV shows and movies to Minor Plaintiff B.E. despite Minor Plaintiff B.E. exclusively using the Kids' Section of the Platform.

28. Since allowing Minor Plaintiff B.E. to utilize the Platform to view content, Plaintiff Diaz noticed a negative change in Minor Plaintiff B.E.'s behavior. For example, Plaintiff Diaz has heard Minor Plaintiff G.C. using inappropriate language, and Minor Plaintiff G.C. started to talk back to Plaintiff Diaz in manner that Plaintiff Diaz has never observed in Minor Plaintiff G.C. before.

/ / /

/ / /

29. As a result of the inappropriate ads on the Platform and the negative changes in Minor Plaintiff B.E.'s behavior, Plaintiff Diaz had to delete the Platform from Minor Plaintiff B.E.'s devices.

***Plaintiff Lisa Medina and Minor Plaintiff G.C.***

30. Plaintiff Medina and Minor Plaintiff G.C. are citizens of the State of Illinois, residing in Cook County. Plaintiff Medina brings this action on behalf of Minor Plaintiff G.C., and all others similarly situated.

31. In 2025, Minor Plaintiff G.C. utilized Defendants' Platform on the family's personal electronic devices to watch pre-recorded video content hosted in the Kids' Section of Defendants' Platform.

32. Plaintiff Medina never authorized Defendants to disclose any aspect of Minor Plaintiff G.C.'s use of their platform to third parties, including the Private Children's Data that Minor Plaintiff G.C. provided to Defendants by using the Platform.

33. On every occasion that Minor Plaintiff G.C. viewed child-directed video content on the Platform, Minor Plaintiff G.C. was under the age of thirteen, possessed accounts with Google and Microsoft, and accessed Defendants' Platform while logged into those Google and Microsoft accounts on the same device.

34. While Minor Plaintiff G.C. used the Platform, the Platform streamed ads to Minor Plaintiff G.C., including ads that recommended more content to watch on the

Platform. Plaintiff Medina believes these ads contributed to Minor Plaintiff G.C.'s increased screen-time since downloading the Platform.

35. Plaintiff Medina also noticed age-inappropriate ads being shown to Minor Plaintiff G.C. while Minor Plaintiff G.C. watched content on the Platform's Kids' Section. These ads included depictions of individuals kissing and/or touching inappropriately.

36. Since allowing Minor Plaintiff G.C. to utilize the Platform to watch content, Plaintiff Medina noticed a negative change in Minor Plaintiff G.C.'s behavior. For example, Minor Plaintiff G.C. would talk back to Plaintiff Medina and would often rather watch TV than do her homework.

37. As a result of Minor Plaintiff G.C.'s increased screen-time, the inappropriate ads on the Platform, and the negative changes in Minor Plaintiff G.C.'s behavior, Plaintiff Medina has chosen to delete the Platform from Minor Plaintiff G.C.'s devices.

***Plaintiff Oscar Rodriguez and Minor Plaintiff F.R.***

38. Plaintiff Rodriguez and Minor Plaintiff F.R. are citizens of the State of Illinois, residing in LaSalle County. Plaintiff Rodriguez brings this action on behalf of Minor Plaintiff F.R., and all others similarly situated.

/ / /

/ / /

39. In or around 2024, Minor Plaintiff F.R. utilized Defendants' Platform on the family's personal electronic devices to watch pre-recorded video content hosted in the Kids' section of Defendants' Platform.

40. Plaintiff Rodriguez never authorized Defendants to disclose any aspect of Minor Plaintiff F.R.'s use of their platform to third parties, including the Private Children's Data that Minor Plaintiff F.R. provided to Defendants by using the Platform.

41. On every occasion that he viewed child-directed video content on the Platform, Minor Plaintiff F.R. was under the age of thirteen, possessed accounts with Google and Microsoft, and accessed Defendants' Platform while logged into those Google and Microsoft accounts on the same device.

***Plaintiff Stacy Rader and Minor Plaintiff S.C.***

42. Plaintiff Rader and Minor Plaintiff S.C. are citizens of the State of New Jersey, residing in Middlesex County. Plaintiff Rader brings this action on behalf of Minor Plaintiff S.C., and all others similarly situated.

43. In or around September of 2024, Minor Plaintiff S.C. utilized Defendants' Platform on the family's personal electronic devices to watch pre-recorded video content hosted in the Kids' section of Defendants' Platform.

44. Plaintiff Rader never authorized Defendants to disclose any aspect of Minor Plaintiff S.C.'s use of their platform to third parties, including the Private Children's Data that Minor Plaintiff S.C. provided to Defendants by using the Platform.

45. On every occasion that he viewed child-directed video content on the Platform, Minor Plaintiff S.C. was under the age of thirteen, possessed accounts with Google and Microsoft, and accessed Defendants' Platform while logged into those Google and Microsoft accounts on the same device.

***Plaintiff Katrina Montgomery and Minor Plaintiffs J.M., J.A., and J.M.***

46. Plaintiff Montgomery and Minor Plaintiffs J.M., J.A., and J.M. are citizens of the State of Indiana, residing in Marion County. Plaintiff Montgomery brings this action on behalf of Minor Plaintiffs J.M., J.A., and J.M., and all others similarly situated.

47. In or around 2024, Minor Plaintiffs J.M., J.A., and J.M. utilized Defendants' Platform on the family's personal electronic devices to watch pre-recorded video content hosted in the Kids' Section of Defendants' Platform.

48. Plaintiff Montgomery never authorized Defendants to disclose any aspect of Minor Plaintiffs J.M., J.A., and J.M's use of their platform to third parties, including the Private Children's Data that Minor Plaintiffs J.M., J.A., and J.M. provided to Defendants by using the Platform.

49. On every occasion that he viewed child-directed video content on the Platform, Minor Plaintiffs J.M., J.A., and J.M. were under the age of thirteen, possessed accounts with Google and Microsoft, and accessed Defendants' Platform while logged into those Google and Microsoft accounts on the same device.

/ / /

50. While Minor Plaintiffs J.M., J.A., and J.M. used the Platform, the Platform streamed ads to Minor Plaintiffs. For example, some ads recommended more content to watch on the Platform, but the recommended content was not age-appropriate for Minor Plaintiffs J.M., J.A., and J.M.

51. Plaintiff Montgomery also noticed repetitive ads for toys, especially around the holidays, as well as ads for fast food. Plaintiff Montgomery has had to purchase certain of these advertised toys and food options due to Minor Plaintiffs J.M., J.A., and J.M. requesting the same following their exposure to the aforementioned repetitive ads.

52. Plaintiff Montgomery also noticed age-inappropriate ads being shown to Minor Plaintiffs J.M., J.A., and J.M. while they watched content on the Platform's Kids' Section, including ads for nicotine products, ads containing sexual content, and ads depicting inappropriately dressed individuals.

53. As a result of the unpredictability of inappropriate content and ads on the Platform, Plaintiff Montgomery has chosen to delete the Platform from Minor Plaintiffs J.M., J.A., and J.M.'s devices.

54. Plaintiff Montgomery feels she relied on Defendants to provide kid-friendly content to Minor Plaintiffs J.M., J.A., and J.M. and Defendants failed in that regard. As a result, she feels that Defendants violated her trust as both a parent and a consumer.

/ / /

/ / /

***Defendant Paramount Skydance Corporation***

55. Defendant Paramount is a for-profit corporation incorporated in the State of Delaware, with its principal place of business at 5555 Melrose Avenue, Los Angeles, California, in Los Angeles County.

***Defendant Pluto Inc.***

56. Defendant Pluto is a for-profit corporation incorporated in the State of Delaware, with its principal place of business at 700 N. San Vicente Boulevard, 9th Floor, West Hollywood, CA, in Los Angeles County.

## III. JURISDICTION AND VENUE

57. This Court has subject matter jurisdiction pursuant to the Class Action Fairness Act of 2005 ("**CAFA**"), 28 U.S.C. § 1332(d). The amount in controversy exceeds the sum of $5,000,000 exclusive of interest and costs, there are more than 100 putative class members and minimal diversity exists because Plaintiffs and many putative class members are citizens of a different state than Defendants. This Court also has supplemental jurisdiction pursuant to 28 U.S.C. § 1367(a) because all claims alleged herein form part of the same case or controversy.

58. This Court has federal question jurisdiction under 28 U.S.C. § 1331 because this Complaint alleges question of federal laws under the VPPA (18 U.S.C. § 2710, *et seq.*) and ECPA (18 U.S.C. § 2511, *et seq.*).

/ / /

59. This Court also has supplemental jurisdiction pursuant to 28 U.S.C. § 1367(a) because all claims alleged herein from part of the same case or controversy.

60. This Court has personal jurisdiction over Defendants because Defendants operate and maintain their principal places of business in this District. Further, Defendants are authorized to, and regularly conduct business in, this District and make decisions regarding corporate governance and management of the Platform in this District, including decisions regarding the privacy of user's Private Children's Data and the incorporation of the Tracking Tools.

61. Venue is proper in this District under 28 U.S.C. § 1391(a)-(d) because: a substantial part of the events giving rise to this action occurred in this District, including decisions made by Defendants' governance and management personnel or inaction by those individuals that led to the unauthorized sharing of Plaintiffs' Children' Private Children's Data; Defendants' principal places of business are located in this District; Defendants collect and redistribute Class Members' Private Children's Data in this District; and Defendants caused harm to Class Members residing in this District, including Minor Plaintiff B.E.

## IV. <u>FACTUAL ALLEGATIONS</u>

### C. THE CHILDREN'S ONLINE PRIVACY PROTECTION ACT OF 1998

62. Congress passed COPPA in 1998 to codify the societal expectations of privacy with regards to minor children's usage of the Internet. COPPA is intended to

"maintain the security of personally identifiable information of children collected online" and to "protect children's privacy by limiting the collection of personal information from children without parental consent."[15]

63. COPPA "prohibits unfair … acts or practices in connection with the collection, use, and/or disclosure of personal information from and about children on the Internet." 16 C.F.R. § 312.1. Moreover, COPPA specifically prohibits "an operator of a website or online service…[from] collect[ing] personal information from a child in a manner that violates the regulations prescribed [by the Federal Trade Commission ("**FTC**")]" where the website or online service is "directed to children" or the website operator "has actual knowledge that it is collecting personal information from a child[.]" 15 U.S.C. § 6502.

64. When passed in 1998, COPPA defined "personal information" as meaning:

> individually identifiable information about an individual collected online, including--(A) a first and last name; (B) a home or other physical address including street name and name of a city or town; (C) an e-mail address; (D) a telephone number; (E) a Social Security number; (F) any other identifier that the Commission determines permits the physical or online contacting of a specific individual; or (G) information concerning the child or the parents of that child that the website collects online from the child and combines with an identifier described in this paragraph.

15 USCS § 6501 (1998).

---

[15] *Dissenting Statement of FTC Commissioner Rebecca Kelly Slaughter In the Matter of Google LLC and YouTube, LLC*, FEDERAL TRADE COMMISSION (Sep. 9, 2019), *available online at*: https://www.ftc.gov/system/files/documents/public_statements/1542971/slaughter_google_youtube_statement.pdf.

65. Then, in 2013, COPPA was enhanced, and its definition of "personal information" was widened to explicitly include "persistent identifier[s] that can be used to recognize a user over time and across different Web sites or online services" including "customer number[s] held in a cookie," "Internet Protocol (IP) address[es]," "processor or device serial number[s]," and "unique device identifier[s.]" 16 C.F.R. § 312.2.

66. To comply with COPPA, website operators collecting information from children must:

> provide notice on the website of what information is collected from children by the operator, how the operator uses such information, and the operator's disclosure practices for such information; and … obtain verifiable parental consent for the collection, use, or disclosure of personal information from children[.]

15 U.S.C. § 6502(b)(1)(A).

67. In order to determine whether a website or online service is "directed to children" the FTC considers the website's:

> subject matter, visual content, use of animated characters or child-oriented activities and incentives, music or other audio content, age of models, presence of child celebrities or celebrities who appeal to children, language or other characteristics of the Web site or online service, as well as whether advertising promoting or appearing on the Web site or online service is directed to children.

16 CFR § 312.2.

68. The video content watched by Plaintiffs' Children on the Platform is obviously "directed to children" under the meaning of COPPA, as it consists of

television shows and movies explicitly produced for a child audience, and hosted by Defendants on the Kids' Section of the Platform.

69. Accordingly, Defendants' collection and disclosure of personally identifiable information without obtaining parental permission from minor users of the Platform, like Plaintiffs' Children, constitutes a violation of COPPA.

**D. THE VIDEO PRIVACY PROTECTION ACT**

70. The VPPA was passed in 1988 in response to Congress's concern that "the trail of information generated by every transaction that is now recorded and stored in sophisticated record-keeping systems is a new, more subtle and pervasive form of surveillance." S. Rep. No. 100-599, at p. 7 (1988) (statement of Sen. Patrick Leahy).

71. In passing the VPPA, Congress was particularly alarmed about surveillance of Americans' media consumption, recognizing that:

> Books and films are the intellectual vitamins that fuel the growth of individual thought. The whole process of intellectual growth is one of privacy-of quiet, and reflection. This intimate process should be protected from the disruptive intrusion of a roving eye…These records are a window into our loves, lives, and dislikes.

*Id*. (statement of Rep. Al McCandless).

72. Although the VPPA was originally intended to protect the privacy of an individual's rental videotape selections, Congress has repeatedly reiterated that the VPPA is applicable to "'on-demand' cable services and Internet streaming services

[that] allow consumers to watch movies or TV shows on televisions, laptop computers, and cell phones." S. Rep. 112-258, at p. 2.[16]

73. Under the VPPA, "[a] video tape service provider" is prohibited from "knowingly disclos[ing], to any person, personally identifiable information concerning any consumer of such provider" without the consumer's "informed, written consent… in a form distinct and separate from any form setting forth other legal or financial obligations of the consumer." 18 U.S.C. § 2710(b).

74. The VPPA defines a "video tape service provider" as "any person, engaged in the business, in or affecting interstate or foreign commerce, of rental, sale, or delivery of pre-recorded video cassette tapes or similar audio-visual materials." 18 U.S.C. § 2710(a)(4).

75. The VPPA additionally defines "personally identifiable information" as "information which identifies a person as having requested or obtained specific video materials or services from a video service provider." 18 U.S.C. § 2710(a)(3).

/ / /

[16] *See also The Video Privacy Protection Act: Protecting Viewer Privacy in the 21st Century*, SENATE JUDICIARY, SUBCOMMITTEE ON PRIVACY, TECHNOLOGY AND THE LAW (Jan. 31, 2012), *available online at* https://www.judiciary.senate.gov/download/hearing-transcript_-the-videoprivacy-protection-act-protecting-viewer-privacy-in-the-21st-century (statement by Senator Leahy, who originally introduced the VPPA in the Senate: "Now, it is true that technology has changed…but I think we should all agree that we have to be faithful to our fundamental right to privacy and freedom. Today the social networking, video streaming, the cloud, mobile apps, and other new technologies have revolutionized the availability of Americans' information.").

76. Defendants are inarguably video tape service providers under the meaning of the VPPA. Paramount's primary business is delivering video content to "audiences across platforms worldwide…through [its] studios, networks, [and] streaming services[.]"[17] And Pluto TV, Pluto's sole product, is a video streaming service hosting 700,000 hours of pre-recorded content.[18] Accordingly, Defendants' disclosure of the specific videos viewed by users of the Platform, like Plaintiffs' Children, constitutes a violation of VPPA. *See*, *e.g.*, *Fan v. NBA Props. Inc*., No. 23-cv-05069-SI, 2024 U.S. Dist. LEXIS 57205, at *9 (N.D. Cal. Mar. 26, 2024) ("in enacting the VPPA, 'Congress[] inten[ded] to cover new technologies for pre-recorded video content'" and "used 'similar audio visual materials' to ensure that VPPA's protections would retain their force even as technologies evolve").

**E. DEFENDANTS' USE OF THIRD-PARTY TRACKING TECHNOLOGIES**

**i. Google and Microsoft's Mass Advertising Surveillance Operation**

77. Google is the largest digital advertiser in the country, accounting for 26.8-percent of the total digital advertising revenue generated in the United States.[19] In 2023,

[17] *About*, PARAMOUNT, https://www.paramount.com/about (last visited Aug. 1, 2025).
[18] *Pluto TV*, PARAMOUNT, https://www.paramount.com/brands/pluto-tv (last visited Aug. 1, 2025).

Google's advertising revenue of $238 billion accounted for 77-percent of its total revenue for the year.[20]

78. Google advertises Google Analytics and other Business Tools to web service operators, like Defendants, claiming they will allow the operator to "[u]nderstand [their] site and app users," "check the performance of [their] marketing," and "[g]et insights only Google can give."[21] But, in order for operators to get information from Google Analytics about their website's visitors, they must allow data collection through installation of Google's Tracking Tools on their website.[22]

79. Indeed, on its *Privacy & Terms* page, Google admits that it collects information from third party websites, stating that "[m]any websites and apps use

---

[19] *Share of major ad-selling companies in digital advertising revenue in the United States*, STATISTA (May 2024), https://www.statista.com/statistics/242549/digital-ad-market-share-of-major-ad-selling-companies-in-the-us-by-revenue/#:~:text=In%202023%2C%20Google%20accounted%20for,21.1%20and%2012.5%20percent%2C%20respectively https://www.scientificamerican.com/article/7-in-10-smartphone-apps-share-your-data-with-third-party-services/ (last visited Aug. 1, 2025).

[20] Florian Zandt, *Google's Ad Revenue Dwarfs Competitors*, STATISTA (Sep. 10, 2024), https://www.statista.com/chart/33017/annual-advertising-revenue-of-selected-tech-companies-offering-search-solutions/#:~:text=Online%20advertising&text=Alphabet%2C%20the%20company%20behind%20the,overall%20revenue%20this%20past%20year (last visited Aug. 1, 2025).

[21] *Welcome to Google Analytics*, GOOGLE, https://analytics.google.com/analytics/web/provision/?authuser=0#/provision (last visited Aug. 1, 2025).

[22] *See* Aaron Ankin & Surya Matta, *The High Privacy Cost of a "Free" Website*, THE MARKUP, https://themarkup.org/blacklight/2020/09/22/blacklight-tracking-advertisers-digital-privacy-sensitive-websites (last visited Aug. 1, 2025).

Google services to improve their content and keep it free. When they integrate our services, these sites and apps share information with Google."[23]

80. Google also admits that it uses the information collected from third party websites, such as Defendants', to sell targeted advertising, explaining to users that, "[f]or example, a website that sells mountain bikes might use Google's ad services. After you visit that site, you could see an ad for mountain bikes on a different site that shows ads served by Google."[24]

81. Microsoft is the largest software company in the world, offering a diverse portfolio of product offerings including the Windows operating system, Office 365 software suite, LinkedIn professional social networking site, Xbox video gaming platform, as well as numerous targeted advertising products.[25] In 2024, Microsoft generated over $77-billion in revenue, including $12-billion derived from its advertising products.[26]

82. Microsoft markets its Business Tools to website operators, claiming that that its Business Tools can "consolidate user behavior and uncover[] trends, so we can

[23] *Privacy & Terms – How Google uses information from sites or apps that use our services*, GOOGLE, https://policies.google.com/technologies/partner-sites (last visited Aug. 1, 2025).

[24] *Id.*

[25] *Annual Report 2024*, MICROSOFT (Oct. 18, 2024), *available online at*: www.microsoft.com/investor/reports/ar24/.

[26] *Id.*

make your website better together for retail, content publishers, small business owners, and everywhere in between."[27]

83. But, like with Google, website operators using Microsoft's Business Tools must install Microsoft's Tracking Tools on their website. Microsoft readily admits that it:

> generates a unique advertising ID for each person using a device, which app developers and advertising networks can then use for their own purposes, including providing relevant advertising in apps…Microsoft apps and third-party apps can access and use the advertising ID in much the same way that websites can access and use a unique identifier stored in a cookie. Thus, your advertising ID can be used by app developers and advertising networks to provide more relevant advertising and other personalized experiences across their apps and on the web.[28]

84. While Google and Microsoft admit that they collect information from third-party websites through the Tracking Tools, neither provides, nor could provide, a publicly available list of every webpage on which their Tracking Tools are installed. As such, the vague descriptions of Google and Microsoft's data collection practices referenced above could not give Plaintiffs and Class Members any reason to think that Defendants were part of Google and Microsoft's surveillance network. Moreover, as Defendants do not disclose their use of Google and Microsoft's Tracking Tools, Plaintiffs

[27] *Clarity*, MICROSOFT, https://clarity.microsoft.com/ (last visited Aug. 1, 2025)

[28] *Microsoft Privacy Statement*, MICROSOFT, https://www.microsoft.com/en-us/privacy/privacystatement#mainadvertisingidmodule (last visited Aug. 1, 2025).

and Class Members could not have been reasonably expected to review any of Google and Microsoft's privacy statements in connection with their use of the Platform.

85. Google and Microsoft aggregate the user information that they collect from third-party websites into 'advertising profiles' consisting of all of the data that they have collected about a given user.[29] With these advertising profiles, Google and Microsoft can sell hyper-precise advertising services, allowing their clients to target internet users based on combinations of their location, age, race, interests, hobbies, life events (e.g., recent marriages, graduation, or relocation), political affiliation, education level, home ownership status, marital status, household income, type of employment, use of specific apps or websites, and more.[30]

86. In fact, Google and Microsoft value user information so highly that they provide their Business Tools to many website operators for free, all to expand their surveillance apparatus.[31]

---

[29] Bennett Cyphers & Gennie Gebhart, *Behind the One-Way Mirror: A Deep Dive Into the Technology of Corporate Surveillance*, ELECTRONIC FRONTIER FOUNDATION (2019), *available online at*: https://www.eff.org/files/2019/12/11/behind_the_one-way_mirror-a_deep_dive_into_the_technology_of_corporate_surveillance_0.pdf.

[30] *About audience segments*, GOOGLE ADS, https://support.google.com/google-ads/answer/2497941?hl=en#zippy=%2Cin-market-segments%2Caffinity-segments%2Clife-events%2Cdetailed-demographics (last visited Aug. 1, 2025.

[31] *Analytics Overview*, GOOGLE, https://marketingplatform.google.com/about/analytics/ (last visited Aug. 1, 2025) ("Google Analytics gives you the tools, free of charge"); *Clarity*, MICROSOFT, https://clarity.microsoft.com/ (last visited Aug. 1, 2025) ("Enjoy all the features of Clarity at absolutely zero cost. You'll never run into traffic limits or be forced to upgrade to a paid version").

87. When website operators, like Defendants, make use of Google and Microsoft's Business Tools, they are essentially choosing to participate in Google and Microsoft's mass surveillance network, and in return they benefit from Google and Microsoft's collection of user data, at the expense of their website users' privacy. For example, in exchange for allowing it to collect user information, Microsoft allows website operators to target customers using "custom data about users" that Microsoft collects from its other clients.[32] Likewise, Google rewards website operators for providing it with their user's information by granting access to its Analytics platform, which leverages demographic data collected by Google to provide detailed analyses of the website's user base.[33]

**ii. Children Are Specifically Targeted by – and Susceptible to - Online Advertisers**

88. Children are not exempt from this mass surveillance machine. As reported by Vox:

> [T]oday's kids are the most at risk because they have the largest digital footprint in history. Between the Nest cameras watching kids at home, kids' games that target them with ads, and purchase preferences on Amazon and Google, their data is being harvested at an unprecedented rate.[34]

---

[32] *Key-Value Targeting*, MICROSOFT, https://learn.microsoft.com/en-us/xandr/invest/key-value-targeting (last visited Aug. 1, 2025).

[33] *Google Marketing Platform – Features*, GOOGLE, https://marketingplatform.google.com/about/analytics/features/ (last visited Aug. 1, 2025).

[34] Chavie Lieber, *Big tech has your kid's data — and you probably gave it to them* VOX (Dec. 5, 2018), https://www.vox.com/the-goods/2018/12/5/18128066/children-data-surveillance-amazon-facebook-google-apple (last visited Aug. 1, 2025).

89. Why are advertisers willing to potentially violate COPPA to collect data from minors? The answer is simple: children are particularly susceptible to advertising. As the World Health Organization and UNICEF put it in a 2020 report, "Marketing to children is deliberate, strategic, innovative and well-resourced, and exploits their developmental vulnerability."[35]

90. Indeed, research conducted by the American Academy of Pediatrics has found that "[c]hildren are uniquely vulnerable to the persuasive effects of advertising because of immature critical thinking skills and impulse inhibition."[36] As one expert explains:

> There's a lot of neuroscience that explains why adolescents and children are so vulnerable [to advertising]…they're much more attuned to rewards, much less attentive to consequences and risks, much more tolerant of ambiguity, much more sensitive to social cues and much more impulsive, so they don't have a lot of cognitive control…***This is an advertiser's dream***.[37]

---

[35] Tinhinane Medjkoune et al., *Marketing to Children Through Online Targeted Advertising: Targeting Mechanisms and Legal Aspects*, *in* PROCEEDINGS OF THE 2023 ACM SIGSAC CONFERENCE ON COMPUTER AND COMMUNICATIONS SECURITY (Nov. 26-30, 2023), at 1, *available at:* https://arxiv.org/pdf/2310.04104 (citing Helen Clark et al., *A future for the world's children? A WHO-UNICEF-Lancet Commission*, THE LANCET (2020)).

[36] Jenny Radesky, Yolanda Linda Reid Chassiakos, Nusheen Ameenuddin & Dipesh Navsaria, *Digital Advertising to Children*, 146 PEDIATRICS 1681 (Jul. 2020), *available online at*: https://pubmed.ncbi.nlm.nih.gov/32571990/.

[37] *Exposing the Dangers of Targeting Children as Consumers*, UC IRVINE PAUL MERAGE SCHOOL OF BUSINESS (July 3, 2024), https://merage.uci.edu/news/2024/07/Exposing-the-Dangers-of-Targeting-Children-as-Consumers.html (last visited Aug. 1, 2025).

91. In pursuit of this dream, advertisers spend more and more on advertising to children every year. In 2023, United States kids' advertising expenditures totaled nearly ***$3-billion*** – by 2031, that number is projected to reach ***$21-billion***.[38]

92. As a result, the National Financial Educators Council notes that:

> By the time they turn 21, young people will have been exposed to over one million advertisements – many of which are highly-sophisticated ads that encourage them to make purchases based on wants rather than needs.[39]

93. Children also yield immense "pester power" to influence their parents' purchase decisions.[40]

94. If the tactics used by online advertisers are cause for alarm, the products pushed onto children through those tactics are worthy of outright panic.

95. Advertising has been found to lead to behavior change through direct and indirect pathways, which leads to harm through unhealthy behaviors.[41] And digital ads shown to children, in particular, are often not understood by children to be advertisements, reducing their skepticism in the information they are shown.

/ / /

---

[38] *Stop Advertising to Kids – Stop Predatory Advertising*, NATIONAL FINANCIAL EDUCATORS COUNCIL, https://www.financialeducatorscouncil.org/stop-advertising-to-kids/ (last visited Feb. 25, 2025).

[39] *Id.*

[40] Moti et al., *supra* note 1.

[41] Jessica Packer, MEpi et al., *Advertising and Young People's Critical Reasoning Abilities: Systematic Review and Meta-analysis*, 150 PEDIATRICS 1, 2 (Dec. 2022), *available at*: https://pmc.ncbi.nlm.nih.gov/articles/PMC9724173/pdf/PEDS_2022057780.pdf.

96. Researchers have found that exposure to “newer forms of digital marketing” driven by “data collection” and “personalized behavioral marketing driven by machine learning,” is “associated with unhealthy behaviors, such as intake of high-calorie, low-nutrient food and beverages; use of tobacco products and electronic cigarettes; use of alcohol and marijuana; and indoor tanning.”[42]

97. The resulting harm to our children is staggering. To take one of many examples, in 1971, cigarettes were banned on television and radio when multiple studies revealed that “attention and receptivity to cigarette advertising is correlated with both current and future use [by minors].”[43] Now, over fifty years later, nicotine peddlers have adapted their product and their method by pushing e-cigarettes through data-driven “social media influencers, hashtags, music videos, and other informal social media presence” advertising.[44] As a result, the “United States is seeing an explosive rise of adolescents’ vaping and the renormalization of smoking” driven by a drastic increase in e-cigarette use among high schoolers.”[45]

/ / /

/ / /

---

[42] Radesky, *supra* note 36.

[43] *Id*.

[44] *Id*.

[45] Kristen Jones & Gary A Salzman, *The Vaping Epidemic in Adolescents*, 117 MO. MED. 56-58 (Jan. 2020), *available online at*: https://pmc.ncbi.nlm.nih.gov/articles/PMC7023954/.

98. The U.S. Surgeon General has further warned of growing concerns about screen addiction and mental health issues associated with increased screen time.[46] Research has found that, on average, children aged 8-12 spend over 5.5 hours daily on screens, while children aged 13-18 spend nearly 9 hours daily on screens.[47] Targeted and immersive advertisements contribute to the addictive nature of the platforms, increasing the health risks.

99. Online child-targeted advertising is a big problem – but without the data collected by companies like Defendants, it would not be nearly as effective.

100. As the Director of the FTC's Bureau of Consumer Protection wrote:

> In this moment, it is clear that inaction is not an option. Nor is it an option to place the burden entirely on parents to protect their children from these harms. Although it may have been reasonable at one time to expect a parent to monitor kids' media and advertising exposure (e.g., via a television in the living room for an hour a day), we no longer live in that world. Kids are spending many hours a day online on very small screens that they can take anywhere. It is unrealistic to think parents can sufficiently monitor this type of digital media use, especially in households with working parents, single parents, parents who do not speak English as their first language, or those who face other challenges or time constraints. And even if parents could magically monitor the vast majority of their kids' time

---

[46] Samuel Levine, Director of the Bureau of Consumer Protection, *Preface*, *in Protecting Kids from Stealth Advertising in Digital Media*, FTC (Sept. 2023), *available at:* https://www.ftc.gov/system/files/ftc_gov/pdf/p214505kidsadvertisingstaffperspective092023.pdf; *see also* Cecilia Kang et al., *Meta and YouTube Found Negligence in Landmark Social Media Addiction Case*, NEW YORK TIMES (Mar. 25, 2026), https://www.nytimes.com/2026/03/25/technology/social-media-trial-verdict.html (last visited Apr. 29, 2026).

[47] Deborah Roedder John et al., *Understanding the Past and Preparing for Tomorrow: Children and Adolescent Consumer Behavior Insights from Research in Our Field*, 9 J. OF THE ASS'N FOR CONSUMER RES. 107, 111 (April 2024).

online, it would be nearly impossible for them to keep up with the ever-changing technology and digital landscape.[48]

**iii. Pixels Can Record Almost Every Interaction Between a User and a Platform**

101. In order to use Google and Microsoft's Business Tools, Defendants took several affirmative steps to install and configure Google and Microsoft's Tracking Tools, including tracking Pixels, onto their website.[49]

102. Pixels are one of the tools used by website operators to track user behavior. As the FTC explains, a Pixel is:

> [A] small piece of code that will be placed into the website or ad and define [the Pixel operator's] tracking goals such as purchases, clicks, or pageviews…
>
> Pixel tracking can be monetized several ways. One way to monetize pixel tracking is for companies to use the tracking data collected to improve the company's own marketing campaigns…Another is that companies can monetize the data collected by further optimizing their own ad targeting systems and charging other companies to use its advertising offerings.[50]

103. Pixels can collect a shocking amount of information regarding an individual's online behavior, including the webpages viewed by the user, the amount of

---

[48] *Id.*

[49] *See [GA4] Set up Analytics for a website and/or app*, ANALYTICS HELP, https://support.google.com/analytics/answer/9304153?hl=en (last visited Oct. 20, 2025) (process for installing Google Analytics on a website); *Setup Clarity*, MICROSOFT LEARN (Aug. 13, 2025), https://learn.microsoft.com/en-us/clarity/setup-and-installation/clarity-setup (last visited Oct. 20, 2025).

[50] *Lurking Beneath the Surface: Hidden Impacts of Pixel Tracking*, FEDERAL TRADE COMMISSION – OFFICE OF TECHNOLOGY (Mar. 6, 2023), https://www.ftc.gov/policy/advocacy-research/tech-at-ftc/2023/03/lurking-beneath-surface-hidden-impacts-pixel-tracking (last visited Aug. 1, 2025).

time spent by the user on specific webpages, the specific buttons and hyperlinks that the user clicks, the items that the user adds to an online shopping cart, the purchases that a user makes through an online retailer, the text entered by the user into a website search bar, and even the information provided by the user on an online form.[51] Microsoft's Clarity tool even provides detailed telemetric data showing, *inter alia*, where the user moves their mouse while using a webpage, how far they scroll, and the areas of the webpage they spent the most time reviewing.[52]

104. But most internet users are completely unaware that substantial information about their internet usage is being collected through tracking Pixels. The FTC warns that:

> Traditional controls such as blocking third party cookies may not entirely prevent pixels from collecting and sharing information. Additionally, many consumers may not realize that tracking pixels exist because they're invisibly embedded within web pages that users might interact with…Academic and public reporting teams have found that thousands of the most visited webpages have pixels and other methods that leak personal information to third parties.[53]

/ / /

/ / /

---

[51] *See id.*; *How does retargeting on Facebook help your business?*, META, https://www.facebook.com/business/goals/retargeting (last visited Aug. 1, 2025); Tom Kemp, *"Oops! I Did It Again" … Meta Pixel Still Hoovering Up Our Sensitive Data*, MEDIUM, https://tomkemp00.medium.com/oops-i-did-it-again-meta-pixel-still-hoovering-up-our-sensitive-data-f99c7b779d47#_ftn1 (last visited Aug. 1, 2025).

[52] *Heatmaps*, MICROSOFT, https://clarity.microsoft.com/ (last visited Aug. 1, 2025).

[53] *Lurking Beneath the Surface, supra* note 50.

### iv. The Pixels Installed on Defendants' Platform Transmit Personally Identifiable Information to Google and Microsoft

105. Every website is hosted by a computer "server" that holds the website's contents.

106. To access a website, individuals use "web browsers." Web browsers are software applications that allow consumers to navigate the web and view and exchange electronic information and communications over the Internet. Each "client device" (such as a computer, tablet, or smartphone) accesses web content through a web browser (such as Google's Chrome, Mozilla's Firefox, Apple's Safari, or Microsoft's Edge).

107. Communications between a website server and web browser consist of Requests and Responses. Any given browsing session may consist of hundreds or even thousands of individual Requests and Responses. A web browser's Request essentially asks the website to provide certain information, such as the contents of a given webpage when the user clicks a link, and the Response from the website sends back the requested information – the web pages' images, words, buttons, and other features that the browser shows on the user's screen as they navigate the website.

108. Additionally, on most websites, the Response sent back to the user's web browser directs the browser to create small files known as 'cookies' on the user's device.[54] These cookies are saved by the user's web browser, and are used to identify

---

[54] *What is a web browser?*, MOZILLA, https://www.mozilla.org/en-US/firefox/browsers/what-is-a-browser/ (last visited Aug. 1, 2025).

the website user and information about them as they browse the website or on subsequent visits to the site.[55] For example, in a more innocuous use case, a cookie may allow the website to remember a user's name and password, language settings, or shopping cart contents.[56]

109. When a Google and/or Microsoft user logs onto their account, their web browser records a Google and/or Microsoft tracking cookie.[57] Google's and Microsoft's tracking cookies contain one or more unique identifiers precisely so each individual whose data is sent through the Tracking Technologies can be identified and targeted. Google's identifiers include the "tid" identifier, "cid" identifier, and "sid" identifier; Microsoft's "MUID" is its primary identifier. These cookies and identifiers all serve the same purpose—to uniquely track and identify consumers.

110. These identifiers are connected to the user's Google and/or Microsoft account.[58] With regards to Microsoft, this information is even linked to the individual's LinkedIn profile, which contains significant identifying information including the

---

[55] *Id.*
[56] *Id.*
[57] Cyphers, *supra* note 29.
[58] *Id.*

individual's name, location, contact information, educational background, and work history.[59]

111. In this way, these unique identifiers serve a similar function to social security numbers used by the United States Government—they are associated with only one person, much like the Government knows which specific person is associated with each social security number. Likewise, the Tracking Tool Providers know which specific person is associated with each of their unique identifiers. These identifiers link specific individuals to the data Google and Microsoft have about them, thereby identifying those individuals in a far more effective manner than an individuals' name is able to identify them because most names are not unique.

112. The Pixels combine the data received from the browser with Microsoft's and Google's identifiers, and transmit the information back to Google and Microsoft. As a result, Google and Microsoft link all of the user information collected by their Pixels on the Defendants' Platform to the user's identity, via the user's Google or Microsoft profile. Thus, even if a user never actually logs into a website, or fills out a form, they can still be identified by the Tracking Tools.

/ / /

[59] Mallory Harwood, *Reach specific audiences with LinkedIn Profile Targeting*, MICROSOFT ADVERTISING BLOG (Mar. 9, 2022), https://about.ads.microsoft.com/en/blog/post/march-2022/reach-specific-audiences-with-linkedin-profile-targeting (last visited Aug. 1, 2025).

113. A remarkable number of Americans possess a Google or Microsoft account. Approximately 230 million Americans use Microsoft's Windows operating system,[60] and 230-million Americans are members of Microsoft's LinkedIn social network.[61] One-third of Americans have accounts with Google's Gmail e-mail client, and over 80-percent of Americans use YouTube, Google's video client.[62] When these users visit a web service, like Defendants', that utilizes a Google or Microsoft Pixel, any information collected by the Pixel can be linked to the user's identity through the Google and Microsoft cookies installed on the user's web browser.

114. However, it is not only Google and Microsoft account holders that are at risk of having Pixel-collected website data linked to their identities. Rather, Google and Microsoft utilize sophisticated data tracking methods to identify even those few users who do not have a Google or Microsoft account.

---

[60] Medhi Rizvi, *How Many People Use Windows Worldwide*, TECH SEARCHERS (Apr. 15, 2025), How Many People Use Windows Worldwide - Tech Searchers (last visited Oct. 17, 2025).

[61] Naveen Kumar, *How Many People Use LinkedIn In 2025*, DEMANDSAGE (May 14, 2025), https://www.demandsage.com/linkedin-statistics/ (last accessed Aug. 27, 2025).

[62] *See* Harsha Kiran, *49 Gmail Statistics To Show How Big It Is In 2024*, TECHJURY (Jan. 3, 2024), https://techjury.net/blog/gmail-statistics/ ((last accessed Aug. 27, 2025) ("Gmail accounts for 130.9 million of the total email users in the US"). The United States population is approximately 337.4 million. *See* UNITED STATES CENSUS BUREAU, https://www.census.gov/popclock/ (last accessed Aug. 27, 2025); Jeffrey Gottfried, *Americans' Social Media Use*, PEW RESEARCH (Jan. 31, 2024), https://www.pewresearch.org/internet/2024/01/31/americans-social-media-use/ (last visited Aug. 27, 2025).

115. Google and Microsoft's Pixels, like those on the Platform, can acquire information about the user's device and browser, such as their screen resolution, time zone setting, browser software type and version, operating system type and version, language setting, and IP address.

116. An internet user's combination of such device and browser characteristics, commonly referred to as their "browser fingerprint," is "often unique."[63] By tracking this browser fingerprint, Google and Microsoft are able to compile a user's activity across the internet.[64] Moreover, as Google and Microsoft continuously compile user data over time, their understanding of the user's browser fingerprint becomes more sophisticated such that they need only to collect a single piece of identifying information to identify the user linked to a browser fingerprint.

117. While debating the VPPA on the Senate floor in 1988, Senator Patrick Leahy remarked:

> [I]n an era of interactive television cables, the growth of computer checking and check-out counters, of security systems and telephones, all lodged together in computers, it would be relatively easy at some point to give a profile of a person and tell what they buy in a store, what kind of food they like, what sort of television programs they watch, who are some of the people they telephone…I think that is wrong. I think that really is Big Brother, and I think it is something that we have to guard against…
> [Privacy] is not a conservative or a liberal or moderate issue. It is an issue that goes to the deepest yearnings of all Americans that we are free and we cherish our freedom and we want our freedom. We want to be left alone.

---

[63] Cyphers, *supra* note 29.
[64] *Id*.

S. Rep. No. 100-599 at pp. 5-6 (1988).

118. Now, almost forty years later, Senator Leahy's nightmare has become reality. Through the use of Internet surveillance technology, almost every facet of our relationships, interests, aspirations, and beliefs can be tracked, recorded, and packaged for corporate profit by website operators like Defendants.

119. Through this action, Plaintiffs seek to send Defendants, and other corporations like them, the same message that Senator Leahy elucidated during the Internet's infancy: "[W]e are free and we cherish our freedom and we want our freedom. We want to be left alone." *Id*.

**v. Defendants Disclosed Plaintiffs' Children's and Class Members' Private Children's Data to Google and Microsoft**

120. Defendants' video content can be accessed on the Platform on the Internet or by using Defendants' many mobile, tablet, smart TV, and desktop apps. Plaintiffs' Children all accessed the Platform and viewed Defendants' video content.

121. Unbeknownst to Plaintiffs, Plaintiffs' Children, and Class Members, Defendants intentionally configured the Google and Microsoft Pixels installed on the Platform to capture and transmit the Private Children's Data that Plaintiffs' Children and Class Members communicated to Defendants while watching their video content on the Platform to at least two unauthorized parties.

122. For example, the following screenshots ("Figures 1 & 2") depicts network transmission data captured while an Internet user watches a video on the Kids' Section

of the Platform. Figures 1 & 2 show that when Platform visitors, like Plaintiffs' Children and Class Members, view Defendants' video content, the information requested and transmitted to Google and Microsoft by the Tracking Tools installed on Defendant's website include the title of the video, and the URL at which the video is located.

123. Further, the information transmitted to Google and Microsoft is accompanied by specific lines of code linking the information to the user's identity.

124. Figure 1 depicts network transmissions made to Microsoft from the Kids' Section of the Platform. As Figure 1 shows, alongside the title of the video (in this example, "Rugrats Go Wild") and its URL, Defendants' Platform transmitted the identifier number attached to the user's "MUID" cookie which identifies the user's Microsoft account. Additionally, the list of bracketed number coordinates in Figure 1 encode detailed telemetric data recorded by the Tracking Tool showing, *inter alia*, where the user moved their mouse, how far they scrolled, and the areas of the webpage that the user spent the most time reviewing. Defendants' Platform also transmitted information that is commonly used to create a browser fingerprint, such as the user's IP address, language selection, screen resolution, microprocessor type, internet browser software and version number, and operating system software and version number.

/ / /

/ / /

/ / /

```
POST https://i.clarity.ms/collect HTTP/1.1
Host: i.clarity.ms
Connection: keep-alive
Content-Length: 5810
sec-ch-ua-platform: "Windows"
User-Agent: Mozilla/5.0 (Windows NT 10.0; Win64; x64) AppleWebKit/537.36 (KHTML, like Gecko) Chrome/138.0.0.0
Safari/537.36
sec-ch-ua: "Not)A;Brand";v="8", "Chromium";v="138", "Google Chrome";v="138"
Content-Type: text/plain;charset=UTF-8
sec-ch-ua-mobile: ?0
Accept: */*
Origin: https://pluto.tv
Sec-Fetch-Site: cross-site
Sec-Fetch-Mode: no-cors
Sec-Fetch-Dest: empty
Sec-Fetch-Storage-Access: active
Referer: https://pluto.tv/
Accept-Encoding: gzip, deflate, br, zstd
Accept-Language: en-US,en;q=0.9
Cookie: MUID=2931C5CC117164B511B2D3D710CF6587

{"e":["0.8.19",4,6622,1649,"9mlh9nu2wz","j3xank","eikrll",6,1,1,0,"https://pluto.tv/us/on-
demand/movies/61c2323f68b5ad001a6211e1/details"],"a":[[1197,12,680,68,961],[1219,12,680,72,959],[1227,12,680,73,9
58],[1257,12,636,88,952],[1267,12,636,91,951],[1272,12,597,100,948],[1279,12,408,110,945],[1287,12,408,121,942],[
1318,12,596,147,932],[1324,12,596,154,925],[1332,12,596,163,917],[1339,12,596,176,901],[1347,12,408,185,891],[137
7,12,4647,282,801],[1386,12,4647,305,783],[1422,12,4647,387,725],[1444,12,4647,401,713],[1489,12,5163,412,694],[1
805,12,5163,412,695],[1842,12,5163,412,693],[1857,12,5163,412,692],[1880,12,5163,412,690],[1902,12,5163,412,687],
[1910,12,5163,412,684],[1917,12,5162,413,681],[1924,12,4620,416,672],[1932,12,4620,420,661],[1939,12,4563,423,649
],[1947,12,4563,427,637],[1954,12,4980,430,623],[1962,12,4980,434,613],[1969,12,4980,438,601],[1977,12,4980,444,5
80],[1984,12,4980,446,569],[1992,12,4980,448,546],[1999,12,4980,451,531],[2007,12,4980,452,519],[2014,12,4980,453
,499],[2024,12,4980,454,489],[2029,12,4980,454,475],[2044,12,4980,455,457],[2068,12,4980,456,447],[2090,12,4980,4
58,437],[2105,12,4980,458,433],[2119,12,4980,458,432],[2269,15,4980,458,432],[2307,15,4980,458,432],[2344,15,4980
,458,432],[2352,15,4980,458,432],[2374,15,4980,458,431],[2389,15,4980,456,430],[2397,12,548,455,429],[2415,12,548
,453,428],[2434,12,548,446,419],[2443,12,548,442,413],[2465,12,548,436,403],[2472,12,548,434,399],[2488,12,548,42
3,375],[2495,12,548,415,357],[2502,12,548,410,346],[2510,12,548,403,328],[2517,12,548,399,317],[2539,12,548,384,2
74],[2547,12,548,380,263],[2562,12,548,374,247],[2584,12,548,368,230],[2607,12,548,364,224],[2659,12,548,363,224]
,[2674,12,548,359,230],[2682,12,548,354,244],[2691,12,548,351,256],[2697,12,548,348,270],[2719,12,5319,338,319],[
2727,12,5319,334,331],[2734,12,5288,332,343],[2749,12,5288,329,352],[2757,12,4882,328,358],[2764,12,4885,327,360]
,[2787,12,4885,326,371],[2810,12,4885,326,375],[2869,12,4885,327,375],[2884,12,4885,330,380],[2893,12,4882,332,38
2],[2899,12,4935,334,387],[2923,12,4935,341,399],[2944,12,4935,348,414],[2967,12,4935,354,432],[2989,12,4935,359,
443],[3004,12,4935,362,451],[3012,12,4935,362,455],[3028,12,548,363,460],[3049,12,548,364,463],[3072,15,4935,364,
463],[3259,15,4935,364,463],[3499,15,4935,364,463],[3508,12,548,364,464],[3516,12,548,365,464],[3537,12,548,366,4
66],[3559,12,548,368,468],[3710,12,548,369,468],[3740,12,548,370,468],[3784,12,548,371,468],[3859,12,4935,372,468
],[3913,12,4935,373,468],[3919,15,4935,373,468],[3957,15,4935,373,468],[3979,15,4935,374,469],[4002,12,548,374,47
0],[4024,12,548,374,472],[4070,12,548,375,473],[4107,12,548,376,474],[4129,12,548,377,475],[4137,12,548,378,475],
[4159,12,548,378,476],[4183,12,548,380,479],[4204,12,548,384,487],[4228,12,548,390,499],[4249,12,548,393,511],[42
72,12,548,396,529],[4288,12,5049,396,539],[4295,12,4451,396,544],[4309,12,4451,398,554],[4332,12,4451,398,557],[4
347,12,4451,398,561],[4363,12,4450,398,562],[4377,12,4450,398,563],[4444,12,4504,398,564],[4452,12,4504,398,565],
[4474,12,4504,398,567],[4498,12,4504,399,570],[4519,12,4504,400,579],[4542,12,4504,401,588],[4564,12,4504,404,603
],[4572,12,4505,405,605],[4587,12,4505,408,618],[4594,12,4505,410,625],[4602,12,4504,412,631],[4617,12,4504,415,6
40],[4624,12,4511,417,645],[4640,12,4512,423,657],[4647,12,4512,427,663],[4654,12,4511,430,669],[4663,12,5124,435
,678],[4685,12,5124,445,695],[4707,12,5124,455,710],[4729,12,5124,463,723],[4753,12,5124,472,732],[4774,12,5124,4
77,738],[4797,12,5124,485,745],[4812,12,5124,490,748],[4834,12,5124,496,749],[4857,12,5124,501,749],[4879,12,5124
,506,749],[4887,12,5124,507,749],[5045,12,5124,508,749],[5067,12,5124,526,757],[5082,12,5124,545,763],[5098,12,51
24,552,767],[5120,12,5124,553,768],[5143,12,5124,556,769],[5158,12,5124,558,771],[5172,12,5124,559,771],[5187,12,
5124,560,772],[5210,12,5124,562,773],[5232,12,5124,564,775],[5239,12,5124,564,776],[5247,12,5123,566,777],[5269,1
2,4521,567,777],[5284,12,4521,570,779],[5292,12,5126,570,780],[5313,12,5126,572,781],[5322,12,5127,573,781],[5344
,12,5127,576,783],[5367,12,5127,582,784],[5389,12,5127,591,787],[5412,12,5127,600,789],[5434,12,5127,610,791],[54
57,12,5127,615,792],[5479,12,5127,620,793],[5502,12,5127,624,794],[5509,12,5127,626,795],[5539,12,5127,627,795],[
5555,12,5127,628,795],[5577,12,5127,630,795],[5584,12,5127,630,796],[5629,12,5127,631,796],[5644,12,5127,632,797]
,[5674,12,5127,633,797],[5689,12,5127,634,797],[5718,12,5127,635,797],[5727,12,5127,636,797],[5802,12,5127,633,79
7],[5824,12,5127,627,797],[5847,12,5127,620,797],[5869,12,5127,609,796],[5884,12,5127,592,793],[5907,12,5127,575,
797],[5914,12,5123,566,799],[5922,12,5124,562,800],[5944,12,5124,544,803],[5967,12,5124,538,803],[5989,12,5124,53
7,803],[5997,12,5124,536,803],[6027,12,5124,534,804],[6049,12,5124,531,804],[6073,12,5124,526,800],[6094,12,5124,
522,796],[6117,12,5124,518,787],[6140,12,5124,516,777],[6162,12,5124,514,774],[6169,12,5124,514,773],[6192,12,512
4,514,772],[6214,12,5124,512,770],[6237,12,5124,511,768],[6244,12,5124,511,767],[6268,12,5124,510,766],[6275,12,5
124,510,765],[6304,12,5124,510,764],[6343,12,5124,509,764],[6349,12,5124,509,763],[6373,12,5124,508,763],[6402,12
,5124,508,762],[6439,12,5124,508,761],[6462,12,5124,506,759],[6484,12,5124,503,754],[6507,12,5124,500,749],[6529,
12,5124,498,743],[6552,12,5124,496,740],[6574,12,5124,494,737],[6597,12,5124,493,734],[6612,12,5124,492,733],[700
2,12,5124,492,732],[7024,12,5124,492,731],[7212,12,5124,493,731],[8224,9,5124,493,731,16722,9338,0,1,0,"Rugrats
Go Wild","https://pluto.tv/on-
demand/movies/61c2323f68b5ad001a6211e1/details","7f1p8xqxf.4r9h7by4u",1,1],[6622,4,1,1008,1305,1008,1305,0,86846,
67,961,6608,4112,3401,67,961,3317,67,961,3281,67,961,3401,67,961,3401],[8271,0,2,595,3,2,4,6,5,7,7,1,25,244],[827
1,36,6,[7142,0,7674,0,7999,89,8159,51]]]}

Ln 21, Col 137 | 69 of 6,496 characters | Plain text | 100% | Windows (CRLF) | UTF-8
```

*Figure 1*: *Screenshot depicting back-end network traffic from Defendants' Platform which shows information transmitted to Microsoft when users watch a video on the Platform.*

125. Figure 2 depicts network transmissions made to Google from the Platform. As Figure 2 shows, alongside the URL of the video content, Defendants' Platform transmitted the identifier number attached to the Google's 'tid,' 'gjid,' and 'cid' cookies, which identify the user's Google account. Defendants' Platform also transmitted information that is commonly used to create a browser fingerprint, such as the user's IP address, language selection, screen resolution, microprocessor type, internet browser software and version number, and operating system software and version number.

| | |
|---|---|
| v | 1 |
| _v | j101 |
| a | 964435033 |
| t | pageview |
| _s | 1 |
| dl | https://pluto.tv/us/live-tv/673247127d5da5000817b4d6 |
| dr | https://www.google.com/ |
| ul | en-us |
| de | UTF-8 |
| dt | Pluto TV - Drop in. Watch Free. |
| sd | 24-bit |
| sr | 2560x1441 |
| vp | 1008x1305 |
| je | 0 |
| _u | YEBAAAABAAAAACAC~ |
| jid | 1978696658 |
| gjid | 1358294584 |
| cid | 988431445.1753108089 |
| tid | UA-46240460-51 |
| _gid | 792295453.1753108089 |
| _r | 1 |
| _slc | 1 |
| gtm | 45He57g1n81NKZQ5T9v835229433za200 |
| gcs | G111 |
| gcd | 13r3r3r3r5l1 |
| dma | 0 |
| tag_exp | 101509157~103116026~103200004~103233427~104684208~104684211 |
| z | 853348521 |

*Figure 2*: *Screenshot depicting back-end network traffic from Defendants' Platform which shows information transmitted to Google when users watch a video on the Platform.*

126. Defendants' disclosure of the user's browsing information is not limited solely to their use of Defendants' video content. Indeed, any interaction on any page of the Platform is recorded and contemporaneously disclosed to Google and Microsoft in the same manner as depicted in Figures 1 and 2.

127. In their default state, Google and Microsoft's Pixels record and transmit only "automatic events," consisting largely of routine user behavior, such as clicking a link, clicking on an advertisement, or viewing a webpage.[65] Defendants purposely configured the Google and Microsoft Pixels on the Platform to collect and transmit additional user data, including information specifically identifying the videos that the users watch.

128. By installing third-party Tracking Tools, including tracking Pixels, on the Platform, and by further configuring those Tracking Tools to collect the user's Private Children's Data, Defendants knowingly and intentionally caused Plaintiffs' Children's and Class Members' Private Children's Data to be transmitted to third parties, including Google and Microsoft, to monetize the Private Children's Data through the creation of advertising profiles and targeted advertising.

/ / /

---

[65] *Automatically Collected Events*, GOOGLE ANALYTICS HELP, https://support.google.com/analytics/answer/9234069, (last visited on Aug. 1, 2025); *About automatic events, Google Marketing Platform – Features*, GOOGLE, https://marketingplatform.google.com/about/analytics/features/ (last visited Aug. 1, 2025).

**F. DEFENDANTS DISCLOSED PLAINTIFFS' CHILDREN'S AND CLASS MEMBERS' SENSITIVE INFORMATION TO THIRD PARTIES WITHOUT OBTAINING INFORMED CONSENT**

**i. Defendants failed to inform Plaintiffs, Plaintiffs' Children, and Class Members of its disclosure of the Private Children's Data, in violation of its Privacy Policy.**

129. Defendants admit that "some of [their] services are directed to children" and claim to "recognize the need to provide further privacy protections when it comes to children."[66] Moreover, through their Children's Privacy Policy, Defendants represent that they "will obtain parental consent prior to the collection of [children's] Personal Information."[67]

130. Defendants did not abide by these principles and promises. In reality, Defendants collect personally identifying information from minor users of the Platform without obtaining parental consent, and simultaneously share that information with third parties, including Google and Microsoft, in exchange for compensation in the form of advertising, analytics, and marketing services. Then, that data is subsequently used to make data profiles for advertising purposes.

131. Defendants breached Plaintiffs' Children's and Class Members' right to privacy by unlawfully disclosing their Private Children's Data to third parties, including Google and Microsoft. Defendants did not inform Plaintiffs or Plaintiffs' Children that

---

[66] *Children's Privacy Policy*, PARAMOUNT, https://privacy.paramount.com/en/childrens?r=pluto.tv (last visited on Aug. 1, 2025).

[67] *Id.*

it was sharing Plaintiffs' Children's Private Children's Data with third parties, including Google and Microsoft.

132. Google and Microsoft guide and caution website operators of the dangers of using their Business Tools without first providing notice of and then obtaining valid consent for invasively collecting protected data.[68]

133. By engaging in this improper sharing of information without Plaintiffs' and Class Members' consent, Defendants breached their own Privacy Policy, violated Plaintiffs' Children's and Class Members' right to privacy, and unlawfully disclosed the Private Children's Data.

134. Despite never telling Plaintiffs, Plaintiffs' Children, or Class Members, Defendants allowed third parties such as Google and Microsoft to intercept Plaintiffs' and Class Members' Private Children's Data and use it for advertising purposes.

---

[68] *See, e.g.*, *Google Analytics Terms of Service*, GOOGLE MARKETING PLATFORM, https://marketingplatform.google.com/about/analytics/terms/us/ (last visited Oct. 20, 2025) ("You will not . . . pass information, hashed or otherwise, to Google that Google could use or recognize as personally identifiable information . . . ."); *Best practices to avoid sending Personally Identifiable Information (PII)*, ANALYTICS HELP, https://support.google.com/analytics/answer/6366371?hl=en&ref_topic=2919631#zippy=%2Cin-this-article (last visited Oct. 20, 2025) (guiding website owners to configure data redaction to remove personally identifiable information from transmission); *Microsoft Products and Services Data Protection Addendum*, MICROSOFT, *available at: Privacy & Security Terms*, MICROSOFT, https://www.microsoft.com/licensing/terms/product/PrivacyandSecurityTerms/all (last visited Oct. 20, 2025) (Website operators using Clarity "must comply with all laws and regulations applicable to its use of [Clarity], including laws related to biometric data, confidentiality of communications, and Data Protection Requirements.").

**ii. The Tracking Tools Used by Defendants Were Imperceptible to Plaintiffs, Plaintiffs' Children, and Class Members.**

135. The Tracking Tools installed on the Platform were invisible to Plaintiffs, Plaintiffs' Children, and Class Members. Without analyzing the network information transmitted by the Platform through examination of its source code or the use of sophisticated web developer tools, there was no way for a user to discover the presence of the Tracking Tools. As a result, typical internet users, such as Plaintiffs, Plaintiffs' Children, and Class Members, were unable to detect the Tracking Tools on Defendants' Platform. This concern is particularly acute considering that Plaintiffs' Children are minors with no particular technical skills or training.

136. Plaintiffs, Plaintiffs' Children, and Class Members were shown no disclaimer or warning that the Private Children's Data would be disclosed to any unauthorized third party without express parental consent. To the contrary, as noted above, Defendants promised to not disclose Private Children's Data without the parents' consent, thereby misleading any parent who took the time to review the Privacy Policy to ensure their child's safety

137. Plaintiffs, Plaintiffs' Children, and Class Members did not know that the Private Children's Data was being collected and transmitted to an unauthorized third party.

138. Because Plaintiffs, Plaintiffs' Children, and Class Members were not aware of the Google and Microsoft Pixels on the Platform, or that the Private Children's Data

would be collected and transmitted to Google and Microsoft, Plaintiffs and Class Members could not and did not consent to Defendants' conduct.

### G. DEFENDANTS WERE ENRICHED BY THEIR DISCLOSURE OF PLAINTIFFS' CHILDREN'S AND CLASS MEMBERS' SENSITIVE INFORMATION TO THIRD PARTIES

#### i. Defendants Received Material Benefits in Exchange for the Private Children's Data

139. As explained, *supra*, users of Google and Microsoft's Business Tools, like Defendants, receive access to advertising and marketing analytics services in exchange for installing Google and Microsoft's Tracking Tools on their website.

140. Upon information and belief, Defendants, as users of Google and Microsoft's Business Tools, received compensation in the form of advanced advertising and data analysis services and/or cost-effective marketing on third-party platforms in exchange for allowing Google and Microsoft to collect Plaintiffs' Children's and Class Members' Private Children's Data.

#### ii. The Private Children's Data Had Financial Value

141. Moreover, Plaintiffs' Children's and Class Members' Private Children's Data had value, and Defendants' disclosure and interception of that Private Children's Data harmed Plaintiffs' Children and the Class.

142. According to the annual reports of Facebook, another major online advertisement retailer, the value it derives from user data has continuously risen. "In

2013, the average American's data was worth about $19 per year in advertising sales to Facebook, according to its financial statements. In 2020, [it] was worth $164 per year."[69]

143. Conservative estimates suggest that in 2018, Internet companies earned $202 per American user from mining and selling data. That figure is only due to keep increasing; estimates for 2022 are as high as $434 per user, for a total of more than $200 billion industry wide.

144. Several companies have products through which they pay consumers for a license to track certain information. Google, Nielsen, UpVoice, HoneyGain, and SavvyConnect are all companies that pay for browsing history information.

145. The unauthorized disclosure of Plaintiffs' Children's and Class Members' private and Private Children's Data has diminished the value of that information, resulting in harm including Plaintiffs' Children and Class Members.

### H. PLAINTIFFS' CHILDREN'S AND CLASS MEMBERS' REASONABLE EXPECTATION OF PRIVACY

146. At all times when Plaintiffs' Children and Class Members provided their Private Children's Data to Defendants, Plaintiffs, Plaintiffs' Children, and Class Members had a reasonable expectation that the information would remain confidential

---

[69] Geoffrey A. Fowler, *There's no escape from Facebook, even if you don't use it*, THE WASHINGTON POST (Aug. 29, 2021), https://www.washingtonpost.com/technology/2021/08/29/facebook-privacy-monopoly/ (last visited Aug. 1, 2025).

and that Defendants would not share their Children's Private Data with third parties for a commercial purpose without obtaining parental consent.

147. Privacy polls and studies show that the overwhelming majority of Americans consider obtaining an individual's affirmative informed consent before a company collects and shares that individual's data to be one of the most important privacy rights.

148. For example, a recent Consumer Reports study shows that 92-percent of Americans believe that internet companies and websites should be required to obtain consent before selling or sharing consumer data, and the same percentage believe those companies and websites should be required to provide consumers with a complete list of the data that is collected about them.[70]

149. Moreover, Americans are particularly sensitive about protecting the privacy of children. In a survey conducted jointly by the Center for Digital Democracy and Common Sense Media, 90-percent of parents disagreed with the statement: "It is okay for advertisers to track and keep a record of a child's behavior online if they give the child free content[,]" and 93-percent of parents agreed that "a federal law that says that online sites and companies need to ask parents' permission before they collect

---

[70] *Consumers Less Confident About Healthcare, Data Privacy, and Car Safety, New Survey Finds*, CONSUMER REPORTS (May 11, 2017), https://www.consumerreports.org/consumer-reports/consumers-less-confident-about-healthcare-data-privacy-and-car-safety-a3980496907 (last visited Aug. 1, 2025).

personal information from children under age 13" is a "good idea."[71] In light of these results, it is perhaps unsurprising that 80-percent of parents of children 13-years-old or younger report worrying about their child's privacy when using online apps.[72]

150. Personal data privacy and obtaining consent to share Private Children's Data are material to Plaintiffs and Class Members.

## V. TOLLING AND ESTOPPEL

151. Any applicable statutes of limitation have been tolled by Defendants' knowing and active concealment of its incorporation of Google and Microsoft's Tracking Tools into the Platform.

152. The Tracking Tools present on the Platform were and are invisible to the average website visitor.

153. Through no fault or lack of diligence, Plaintiffs, Plaintiffs' Children, and Class Members were deceived and could not reasonably discover Defendants' deception and unlawful conduct.

154. Plaintiffs were ignorant of the information essential to pursue Plaintiffs' Children's claims, without any fault or lack of diligence on their part.

---

[71] *Survey on Children and Online Privacy*, CENTER FOR DIGITAL DEMOCRACY & COMMON SENSE MEDIA (2012), *available online at*: https://democraticmedia.org/assets/resources/COPPA-Executive-Summary-and-Findings-1635879421.pdf.

[72] *Pixalate's Harris Poll Survey Recap: Children's Privacy in Mobile Apps*, PIXALATE (Mar. 1, 2022), https://www.pixalate.com/blog/childrens-online-privacy-harris-poll-recap (last visited Aug. 1, 2025).

155. Defendants knew that their Platform incorporated the Tracking Tools and yet failed to disclose to their users (or, where applicable, their user's parents), that by viewing Defendants' video content through the Platform, their Private Children's Data would be disclosed to unauthorized third parties, including Google and Microsoft. To the contrary, by telling their users that they "will obtain parental consent prior to the collection of [Children's] Personal Information" and further representing a high regard for the privacy of minor users in their Privacy Policy, Defendants misled Plaintiffs into believing that they would not disclose Plaintiffs' Children's information.[73]

156. Under the circumstances, Defendants were under a duty to disclose the nature, significance, and consequences of their collection and treatment of Private Children's Data. In fact, Defendants have still not conceded, acknowledged, or otherwise indicated to Plaintiffs, Plaintiffs' Children, or Class Members that they disclosed or released the Private Children's Data to unauthorized third parties. Accordingly, Defendants are estopped from relying on any statute of limitations.

157. Moreover, all applicable statutes of limitation have also been tolled pursuant to the discovery rule.

/ / /

/ / /

[73] *Children's Privacy Policy*, PARAMOUNT, https://privacy.paramount.com/en/childrens?r=pluto.tv (last visited on Aug. 1, 2025).

158. The earliest that Plaintiffs or Class Members, acting with due diligence, could have reasonably discovered Defendants' conduct would have been shortly before the filing of this Complaint.

## VI. CLASS ALLEGATIONS

159. This action is brought by the named Plaintiffs, on behalf of the Plaintiffs' Children, and a proposed Class of all other persons similarly situated under Federal Rules of Civil Procedure 23(b)(2), 23(b)(3), and 23(c)(4).

160. The Nationwide Class that Plaintiffs seek to represent is defined as follows:

**The Nationwide Class**

All minors who watched a video on the Defendants' Platform and whose Private Children's Data was disclosed or transmitted to Microsoft, Google, or any other unauthorized third party.

161. In addition to the claims asserted on behalf of the Nationwide Class, Plaintiffs assert claims on behalf of separate California, Illinois, Indiana, and New Jersey Subclasses, which are defined as follows:

**California Subclass**

All minors residing in California who watched a video on the Defendants' Platform and whose Private Children's Data was disclosed or transmitted to Microsoft, Google, or any other unauthorized third party.

**Illinois Subclass**

All minors residing in Illinois who watched a video on the Defendants' Platform and whose Private Children's Data was disclosed or transmitted to Microsoft, Google, or any other unauthorized third party.

**New Jersey Subclass**

All minors residing in New Jersey who watched a video on the Defendants' Platform and whose Private Children's Data was disclosed or transmitted to Microsoft, Google, or any other unauthorized third party.

**Indiana Subclass**

All minors residing in Indiana who watched a video on the Defendants' Platform and whose Private Children's Data was disclosed or transmitted to Microsoft, Google, or any other unauthorized third party.

162. Excluded from the proposed Classes are any claims for personal injury, wrongful death, or other property damage sustained by the Class; and any Judge conducting any proceeding in this action and members of their immediate families.

163. Plaintiffs reserve the right to amend the definitions of the Class or add subclasses if further information and discovery indicate that the definitions of the Class should be narrowed, expanded, or otherwise modified.

164. **Numerosity.** The Class is so numerous that the individual joinder of all members is impracticable. Upon information and belief, there are at least 100,000 individuals that have been impacted by Defendants' actions. Moreover, the exact number of those impacted is generally ascertainable by appropriate discovery and is in the exclusive control of Defendants.

165. **Commonality.** Common questions of law or fact arising from Defendants' conduct exist as to all members of the Class, which predominate over any questions

affecting only individual Class Members. These common questions include, but are not limited to, the following:

a) Whether and to what extent Defendants had a duty to protect the Private Children's Data of Plaintiffs' Children and Class Members;

b) Whether Defendants had duties not to disclose the Private Children's Data of Plaintiffs' Children and Class Members to unauthorized third parties;

c) Whether Defendants violated their own privacy policy by disclosing the Private Children's Data of Plaintiffs' Children and Class Members to third parties, including Google and Microsoft, without obtaining the parents' consent;

d) Whether Defendants did and/or could have obtained sufficient consent to permit tracking of Plaintiffs' Children and Class Members.

e) Whether Defendants adequately, promptly, and accurately informed Plaintiffs, Plaintiffs' Children, and Class Members that the Private Children's Data would be disclosed to third parties;

f) Whether Defendants violated the law by failing to promptly notify Plaintiffs, Plaintiffs' Children, and Class Members that the Private Children's Data was being disclosed without their consent;

g) Whether Defendants adequately addressed and fixed the practices which permitted the unauthorized disclosure of Plaintiffs' Children and Class Members' Private Children's Data;

h) Whether Defendants engaged in unfair, unlawful, or deceptive practices by failing to keep the Private Children's Data belonging to Plaintiffs' Children and Class Members free from unauthorized disclosure;

/ / /

i) Whether Defendants violated the statutes asserted as claims in this Complaint;

j) Whether Plaintiffs' Children, and Class Members are entitled to actual, consequential, and/or nominal damages as a result of Defendants' wrongful conduct;

k) Whether Defendants knowingly made false representations as to their data security and/or privacy policy practices;

l) Whether Defendants knowingly omitted material representations with respect to their data security and/or privacy policy practices; and

m) Whether Plaintiffs Rodriguez's and Rader's Children, and Class Members are entitled to injunctive relief to redress the imminent and currently ongoing harm faced as a result of the Defendants' disclosure of their Private Children's Data.

166. **Typicality.** Plaintiffs' Children's claims are typical of those of other Class Members because their Private Children's Data, like that of every other Class Member, was compromised as a result of Defendants' incorporation and use of the Tracking Tools.

167. **Adequacy.** Plaintiffs and Plaintiffs' Children will fairly and adequately represent and protect the interests of the members of the Class in that they have no disabling conflicts of interest that would be antagonistic to those of the other members of the Class. They seek no relief that is antagonistic or adverse to the members of the Class and the infringement of the rights and the damages they have suffered are typical of other Class Members. Plaintiffs have also retained counsel experienced in complex class action litigation and intend to prosecute this action vigorously.

168. **Predominance**. Defendants have engaged in a common course of conduct toward Plaintiffs, Plaintiffs' Children, and Class Members in that the Private Children's Data was unlawfully stored and disclosed to unauthorized third parties, including third parties like Google and Microsoft, in the same way. The common issues arising from Defendants' conduct affecting Class Members set out above predominate over any individualized issues. Adjudication of these common issues in a single action has important and desirable advantages of judicial economy.

169. **Superiority.** A class action is superior to other available methods for the fair and efficient adjudication of the controversy. Class treatment of common questions of law and fact is superior to multiple individual actions or piecemeal litigation. Absent a class action, most Class Members would likely find that the cost of litigating their individual claim is prohibitively high and would therefore have no effective remedy. The prosecution of separate actions by individual Class Members would create a risk of inconsistent or varying adjudications with respect to individual Class Members, which would establish incompatible standards of conduct for Defendants. In contrast, the conduct of this action as a class action presents far fewer management difficulties, conserves judicial resources and the parties' resources, and protects the rights of each Class Member.

/ / /

/ / /

170. Defendants acted on grounds that apply generally to the Class as a whole so that class certification, injunctive relief, and corresponding declaratory relief are appropriate on a class-wide basis.

171. Likewise, particular issues under Fed. R. Civ. P. 23(c)(4) are appropriate for certification because such claims present only particular, common issues, the resolution of which would advance the disposition of this matter and the parties' interests therein. Such particular issues include, but are not limited to:

a) Whether Defendants owed a legal duty to Plaintiffs' Children and the Class to exercise due care in collecting, storing, and safeguarding the Private Children's Data and not disclosing it to unauthorized third parties;

b) Whether Defendants breached a legal duty to Plaintiffs' Children and the Class to exercise due care in collecting, storing, using, and safeguarding the Private Children's Data;

c) Whether Defendants failed to comply with their own policies and applicable laws, regulations, and industry standards relating to data security;

d) Whether Defendants adequately and accurately informed Plaintiffs, Plaintiffs' Children, and Class Members that the Private Children's Data would be disclosed to third parties;

e) Whether Defendants failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the information disclosed to third parties; and

f) Whether Class Members are entitled to actual, consequential, and/or nominal damages and/or injunctive relief as a result of Defendants' wrongful conduct.

/ / /

172. Finally, all members of the proposed Class are readily ascertainable. Defendants have access to identifying information for the Class Members' affected by the unauthorized disclosures described in this Complaint.

**COUNT I**
**VIOLATIONS OF THE VIDEO PRIVACY PROTECTION ACT**
**18 U.S.C. § 2710, *et seq.***
***(On Behalf of Plaintiffs' Children and the Nationwide Class)***

173. Plaintiffs repeat and reallege the allegations contained in paragraphs 1 through 172 as if fully set forth herein.

174. The VPPA provides that "a video tape service provider who knowingly discloses, to any person, personally identifiable information concerning any consumer shall be liable to the aggrieved person[.]" 18 U.S.C. § 2710(b)(1).

175. "Personally identifiable information" is defined to include "information which identifies a person as having requested or obtained specific video materials or services from a video tape service provider." 18 U.S.C. § 2710(a)(3).

176. A "video tape service provider" is "any person, engaged in the business, in or affecting interstate commerce, of rental, sale, or delivery of pre-recorded video cassette tapes or similar audio visual materials." 18 U.S.C. § 2710(a)(4).

177. Defendants are both a "video tape service provider" because their primary business is the production, hosting, and streaming of thousands of videos on the Platform (as well as through other mediums), thereby "engag[ing] in the business, in or affecting

interstate or foreign commerce, of rental, sale, or delivery of pre-recorded video cassette tapes or similar audio visual materials." 18 U.S.C. § 2710(a)(4).

178. Defendants violated the VPPA by knowingly disclosing Plaintiffs' Children's and Class Members' personally identifiable information to Google and Microsoft through the Tracking Tools without obtaining informed, written consent.

179. As a result of Defendants' violation of the VPPA, Plaintiffs, Plaintiffs' Children, and the Class are entitled to all damages available under the VPPA including declaratory and equitable relief, statutory damages of $2,500 for each violation of the VPPA, attorney's fees, filing fees, and costs, and as to Plaintiffs Rodriguez and Rader's Children's and Class Members' continued use of the Platform, injunctive relief.

**COUNT II**
**COMMON LAW INVASION OF PRIVACY**
**(*On Behalf of Plaintiffs' Children and the Nationwide Class and, alternatively, the California, Illinois, New Jersey, and Indiana Subclasses*)**

180. Plaintiffs repeat and reallege the allegations contained in paragraphs 1 through 179 as if fully set forth herein.

181. Plaintiffs, Plaintiffs' Children, and Class Members have an interest in: (1) precluding the dissemination and/or misuse of their, or their children's, Private Children's Data; and (2) making personal decisions and/or conducting personal activities without observation, intrusion or interference, including, but not limited to, the right to visit and interact with various internet sites without being subjected to the exfiltration of their communications without Plaintiffs' and Class Members' knowledge

or consent.

182. Plaintiffs' Children and Class Members had a reasonable expectation of privacy in their communications with Defendants via the Platform and the communications platforms and services therein.

183. Plaintiffs' Children and Class Members communicated Private Children's Data that they intended for only Defendants to receive and that they understood Defendants would keep private and secure.

184. Defendants' disclosure of the substance and nature of those communications to third parties without the knowledge and informed consent of Plaintiffs, Plaintiffs' Children, and Class Members is an intentional intrusion on Plaintiffs' Children's and Class Members' solitude or seclusion.

185. Plaintiffs, Plaintiffs' Children, and Class Members had a reasonable expectation of privacy given Defendants' Privacy Policy and other representations.

186. Moreover, Plaintiffs, Plaintiffs' Children, and Class Members have a general expectation that the communications at issue in this Complaint, including those relating to and identifying Plaintiffs' Children, would be protected from surreptitious disclosure to third parties.

187. Defendants' disclosure of Plaintiffs' Children's and Class Members' Private Children's Data coupled with individually identifying information is highly offensive to the reasonable person.

188. As a result of Defendants' actions, Plaintiffs' Children and Class Members have suffered harm and injury including, but not limited to, an invasion of their privacy rights.

189. Plaintiffs' Children and Class Members have been damaged as a direct and proximate result of Defendants' invasion of their privacy and are entitled to compensatory and/or nominal damages.

190. Plaintiffs, Plaintiffs' Children, and Class Members seek appropriate relief for such injury including, but not limited to, damages that will reasonably compensate them for the harm to their privacy interests as a result of the intrusions upon Plaintiffs' Children's and Class Members' privacy.

191. Plaintiffs, Plaintiffs' Children, and Class Members are also entitled to punitive damages resulting from the malicious, willful and intentional nature of Defendants' actions, directed at injuring Plaintiffs, Plaintiffs' Children, and Class Members in conscious disregard of their rights. Such damages are needed to deter Defendants from engaging in such conduct in the future.

192. Plaintiffs also seek such other relief as the Court may deem just and proper.

/ / /

/ / /

/ / /

/ / /

**<u>COUNT III</u>**

**VIOLATIONS OF THE ELECTRONIC COMMUNICATIONS PRIVACY ACT ("ECPA"), 18 U.S.C. § 2511(1), *et seq*.**

**Unauthorized Interception, Use, and Disclosure**

***<u>(On Behalf of Plaintiffs' Children and the Nationwide Class and, alternatively, the California, Illinois, New Jersey, and Indiana Subclasses)</u>***

193. Plaintiffs repeat and reallege the allegations contained in the paragraphs 1 through 192 as if fully set forth herein.

194. The ECPA protects both sending and receipt of communications.

195. 18 U.S.C. § 2520(a) provides a private right of action to any person whose wire or electronic communications are intercepted, disclosed, or intentionally used in violation of Chapter 119.

196. The transmissions of Plaintiffs' Children's Private Children's Data to Defendants' Platform qualify as "communications" under the ECPA's definition of 18 U.S.C. § 2510(12).

197. <u>Electronic Communications</u>. The transmission of Private Children's Data between Plaintiffs' Children and Class Members and Defendants' Platform with which they chose to exchange communications are "transfer[s] of signs, signals, writing,…data, [and] intelligence of [some] nature transmitted in whole or in part by a wire, radio, electromagnetic, photoelectronic, or photooptical system that affects interstate commerce" and are therefore "electronic communications" within the meaning of 18 U.S.C. § 2510(2).

/ / /

198. Content. The ECPA defines content, when used with respect to electronic communications, to "include[] any information concerning the substance, purport, or meaning of that communication." 18 U.S.C. § 2510(8) (emphasis added).

199. Interception. The ECPA defines the interception as the "acquisition of the contents of any wire, electronic, or oral communication through the use of any electronic, mechanical, or other device" and "contents … include any information concerning the substance, purport, or meaning of that communication." 18 U.S.C. § 2510(4), (8).

200. Electronical, Mechanical or Other Device. The ECPA defines "electronic, mechanical, or other device" as "any device … which can be used to intercept a[n] … electronic communication[.]" 18 U.S.C. § 2510(5). The following constitute "devices" within the meaning of 18 U.S.C. § 2510(5):

a. Plaintiffs' Children's and Class Members' browsers;

b. Plaintiffs' Children's and Class Members' computing devices;

c. Defendants' web-servers; and

d. The Pixel code deployed by Defendants to effectuate the sending and acquisition of website user communications.

201. By utilizing and embedding the Pixels on the Platform, Defendants intentionally intercepted, endeavored to intercept, and procured another person to intercept, the electronic communications of Plaintiffs' Children and Class Members, in violation of 18 U.S.C. § 2511(1)(a).

202. Specifically, Defendants intercepted Plaintiffs' Children's and Class Members' electronic communications via the Pixels, which tracked, stored, and unlawfully disclosed Plaintiffs' and Class Members' Private Information to third parties such as Google and Microsoft.

203. Defendants' intercepted communications include, but are not limited to, communications to/from Plaintiffs' Children and Class Members regarding their Private Children's Data, including the specific videos they viewed on the Platform.

204. By intentionally disclosing or endeavoring to disclose the electronic communications of Plaintiffs' Children and Class Members to third parties, while knowing or having reason to know that the information was obtained through the interception of an electronic communication in violation of 18 U.S.C. § 2511(1)(a), Defendants violated 18 U.S.C. § 2511(1)(c).

205. By intentionally using, or endeavoring to use, the contents of the electronic communications of Plaintiffs' Children and Class Members, while knowing or having reason to know that the information was obtained through the interception of an electronic communication in violation of 18 U.S.C. § 2511(1)(a), Defendants violated 18 U.S.C. § 2511(1)(d).

206. <u>Unauthorized Purpose</u>. Defendants intentionally intercepted the contents of Plaintiffs' Children's and Class Members' electronic communications for the purpose of

committing a tortious act in violation of the Constitution or the laws of the United States or of any State—namely, invasion of privacy, among others.

207. The ECPA provides that a "party to the communication" may be liable where a "communication is intercepted for the purpose of committing any criminal or tortious act in violation of the Constitution or the laws of the United States or of any State." 18 U.S.C § 2511(2)(d).

208. Defendants are not parties for purposes to the communication based on its unauthorized duplication and transmission of communications with Plaintiffs' Children and the Class. However, even assuming Defendants are parties, Defendants' simultaneous, unknown duplication, forwarding, and interception of Plaintiffs' Children's and Class Members' Private Children's Data does not qualify for the party exemption.

209. Defendants' acquisition of sensitive communications that were used and disclosed to Google and Microsoft was done for purposes of committing criminal and tortious acts in violation of the laws of the United States and individual States nationwide as set forth herein, including:

a. Invasion of privacy;

b. Breach of implied contract;

c. Violations of VPPA 18 U.S.C. § 2710, *et seq.*;

d. Violations of the COPPA, 15 U.S.C. 6501, *et seq.*; and

e. Violations of the California Invasion of Privacy Act ("CIPA"), Cal. Pen. Code § 360, *et seq*.

210. Defendants' conduct violated 42 U.S.C. § 1320d-6 in that it used and caused to be used cookie identifiers associated with specific users, including Plaintiffs' Children and Class Members, without user authorization; and disclosed individually identifiable Private Children's Data to Google and Microsoft without authorization.

211. Defendants are not exempt from ECPA liability under 18 U.S.C. § 2511(2)(d) on the grounds that they were a participant in Plaintiffs' Children's and Class Members' communications about their Private Children's Data on the Platform. They used their participation in these communications to improperly share Plaintiffs' Children's and Class Members' Private Information with Google, Microsoft and third-parties that did not participate in these communications. Plaintiffs, Plaintiffs' Children, and Class Members did not know these third parties were receiving the Private Children's Data, and Plaintiffs, Plaintiffs' Children, and Class Members did not consent to third parties receiving their Private Children's Data.

212. As such, Defendants cannot viably claim any exception to ECPA liability.

213. Plaintiffs' Children, and Class Members have suffered damages as a direct and proximate result of Defendants' invasion of privacy in that:

a. Defendants received substantial financial benefits from their use of Plaintiffs' Children's and Class Members' Private Children's Data without providing any value or benefit to Plaintiffs' Children or Class Members;

b. Defendants received substantial financial benefits from their use of Plaintiffs' Children's and Class Members' Private Children's Data without providing any value or benefit to Plaintiffs, Plaintiffs' Children or Class Members;

c. Defendants received substantial, quantifiable value from their use of Plaintiffs' Children's and Class Members' Private Children's Data, such as understanding how people use the Platform and determining what ads people see on the Platform, without providing any value or benefit to Plaintiffs, Plaintiffs' Children, or Class Members;

d. The diminution in value of Plaintiffs' Children's and Class Members' Private Children's Data and/or the loss of privacy due to Defendants making such Private Children's Data, which Plaintiffs, Plaintiffs' Children and Class Members intended to remain private, no longer private.

214. Defendants intentionally used the wire or electronic communications to increase its profit margins. Defendants specifically used the Pixels to track and utilize Plaintiffs' Children's and Class Members' Private Children's Data for financial gain.

215. Defendants were not acting under color of law to intercept Plaintiffs' Children's and the Class Members' wire or electronic communication.

216. Plaintiffs, Plaintiffs' Children, and Class Members did not authorize Defendants to acquire the content of these communications for purposes of invading their privacy via the Tracking Tools.

217. Any purported consent that Defendants may claim to have received from Plaintiffs, Plaintiffs' Children, and Class Members was not valid.

218. In sending and acquiring the content of Plaintiffs' Children's and Class Members' communications relating to the browsing of Defendants' Platform,

Defendants' purpose was tortious, criminal, and designed to violate federal and state legal provisions including a knowing intrusion into a private, place, conversation, or matter that would be highly offensive to a reasonable person.

219. As a result of Defendants' violation of the ECPA, Plaintiffs, Plaintiffs' Children, and the Class are entitled to all damages available under 18 U.S.C. § 2520, including statutory damages of whichever is the greater of $100 a day for each day of violation or $10,000, equitable or declaratory relief, compensatory and punitive damages, and attorney's fees and costs.

**COUNT IV**
**INVASION OF PRIVACY UNDER CALIFORNIA'S CONSTITUTION**
**Cal. Const. Art. 1, § 1**
***(On Behalf of Minor Plaintiff B.E. and the California Subclass)***

220. Minor Plaintiff B.E. repeats and realleges the allegations contained in paragraphs 1 through 219 as if fully set forth herein.

221. Article I, section 1 of the California Constitution provides that "[a]ll people are by nature free and independent and have inalienable rights. Among these are enjoying and defending life and liberty, acquiring, possessing, and protecting property, and pursuing and obtaining safety, happiness, and privacy."

222. The right to privacy in California's constitution creates a private right of action against private and government entities.

223. To state a claim for invasion of privacy under the California Constitution, a plaintiff must establish: (1) a legally protected privacy interest; (2) a reasonable

expectation of privacy, and (3) an intrusion so serious in nature, scope, and actual or potential impact as to constitute an egregious breach of the social norms.

224. Defendant violated Minor Plaintiff B.E.'s and California Subclass Members' constitutional right to privacy by collecting, storing and disclosing their personal information in which they had a legally protected privacy interest and for which they had a reasonable expectation of privacy, in a manner that was highly offensive to Minor Plaintiff B.E. and California Subclass Members and was an egregious violation of social norms.

225. Defendants have intruded upon Minor Plaintiff B.E.'s and California Subclass Members' legally protected privacy interests, including interests in precluding the dissemination or misuse of their confidential Personal Information.

226. Minor Plaintiff B.E. and California Subclass Members had a reasonable expectation of privacy in that: (i) Defendants' invasion of privacy occurred as a result of Defendants' security practices, including the collecting, storage, and unauthorized disclosure of minors' Private Children's Data; (ii) Neither Minor Plaintiff B.E. and California Subclass Members, nor their parents, consented to or otherwise authorized Defendants to disclose their Sensitive Information; and (iii) Minor Plaintiff B.E. and California Subclass Members could not reasonably expect Defendants would commit acts in violation of privacy protection laws.

/ / /

227. As a direct and proximate result of Defendants' invasion of their privacy, Minor Plaintiff B.E. and California Subclass Members have been damaged and have suffered actual and concrete injuries.

228. Minor Plaintiff B.E. and California Subclass Members are entitled to appropriate relief, including damages to compensate them for the harm to their privacy interests, loss of valuable rights and protections, heightened stress, fear, anxiety, risk of future invasions of privacy and the mental and emotional distress and harm to human dignity interests caused by Defendants' invasions.

229. Minor Plaintiff B.E. and California Subclass Members seek appropriate relief for that injury including, but not limited to, damages that will reasonably Minor Plaintiff B.E. and Subclass Members for the harm to their privacy interests, nominal damages, and/or disgorgement of profits made by Defendants as a result of their intrusions upon Minor Plaintiff B.E.'s and Class Members' privacy.

## COUNT V
## VIOLATIONS OF THE CALIFORNIA INVASION OF PRIVACY ACT ("CIPA")
**Cal. Pen. Code § 360, *et seq*.**

***(On Behalf of Minor Plaintiff B.E. and the California Subclass)***

230. Minor Plaintiff B.E. repeats and realleges the allegations contained in paragraphs 1 through 229 as if fully set forth herein.

231. The California Legislature enacted CIPA in response to "advances in science and technology" that "have led to the development of new devices and

techniques for the purpose of eavesdropping upon private communications[,]" recognizing that "the invasion of privacy resulting from the continual and increasing use of such devices and techniques has created a serious threat to the free exercise of personal liberties and cannot be tolerated in a free and civilized society." Cal. Pen. Code. § 630.

232. Under CIPA, it is unlawful to:

i. "[W]illfully and ***without the consent of all parties to the communication***, or in any unauthorized manner, read[], or attempt[] to read, or to learn the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line, or cable, or is being sent from, or received at any place within this state;" or

ii. "[U]se, or attempt[] to use, in any manner, or for any purpose, or to communicate in any way, any information so obtained[;]" or

iii. "[A]id, agree[] with, employ[], or conspire[] with any person or persons to unlawfully do, or permit, or cause to be done any of the acts [prohibited by CIPA.]"

Cal. Penal Code § 631(a) (emphasis added).

233. At all relevant times, Defendants aided, employed, agreed with, and conspired with Google, Microsoft and likely other third parties, to track and intercept Plaintiffs' Children's and Class Members' internet communications while using the Platform, specifically by installing and configuring the Tracking Tools to permit Google and Microsoft to eavesdrop on and intercept in real-time the content of intercept Plaintiffs' Children's and Class Members' private communications with Defendants.

234. The content of those conversations included Private Children's Data, including the specific videos that Plaintiffs' Children and Class Members watched on the Platform. Through Defendants' installation and configuration of the Tracking Tools on the Platform, these communications were intercepted by Google and Microsoft during the communications and without the knowledge, authorization, or consent of Plaintiffs and Class Members.

235. Defendants intentionally inserted electronic devices into the Platform that, without the knowledge and consent of Plaintiffs, Plaintiffs' Children, and Class Members, transmitted the substance of their confidential communications with Defendants to third parties.

236. Defendants willingly facilitated Google's, Microsoft's, and other third parties' interception and collection of Plaintiffs' Children's and Class Members' Private Children's Data by embedding the Tracking Tools on the Platform, thereby assisting Google's and Microsoft's eavesdropping.

237. The following items constitute "machine[s], instrument[s], or contrivance[s]" under the CIPA, and even if they do not, the Tracking Tools fall under the broad catch-all category of "any other manner":

i. The computer codes and programs Google, Microsoft, and other third parties used to track intercept Plaintiffs' Children's and Class Members' communications while they were navigating the Platform;

ii. Plaintiffs' Children's and Class Members' internet browsers;

iii. Plaintiffs' Children's and Class Members' computing and mobile devices;

iv. Google and Microsoft's web and ad servers;

v. The web and ad servers from which Google, Microsoft, and other third parties tracked and intercepted Plaintiffs' Children's and Class Members' communications while they were using a web browser to access or navigate the Platform;

vi. The computer codes and programs used by Google, Microsoft, and other third parties to effectuate their tracking and interception of Plaintiffs' Children's and Class Members' communications while they were using a browser to visit the Platform; and

238. As demonstrated hereinabove, Defendants violated CIPA by aiding and permitting third parties, including Google, Microsoft, and their agents, employees, and contractors, to receive Plaintiffs' Children's and Class Members' Private Children's Data in real time, through the Platform, without obtaining parental consent.

239. By disclosing Plaintiffs' Children's and Class Members' Sensitive information, Defendants violated Plaintiffs' Children's and Class Members' statutorily protected right to privacy.

240. As a result of Defendants' violation of the CIPA, Plaintiffs, Plaintiffs' Children, and Class Members are entitled to treble actual damages related to their loss of privacy in an amount to be determined at trial, statutory damages, attorney's fees, litigation costs, declaratory relief, punitive damages, and as to Plaintiffs Rodriguez and Rader's Children's and Class Members' continued use of the Platform, injunctive relief.

/ / /

**COUNT VI**
**NEGLIGENCE**
***(On Behalf of Plaintiffs' Children and the Nationwide Class and, alternatively, the California, Illinois, New Jersey, and Indiana Subclasses)***

241. Plaintiffs repeat and reallege the allegations contained in paragraphs 1 through 240 as if fully set forth herein.

242. Through using Defendants' Platform, Plaintiffs' Children and Class Members provided it with their Private Children's Data.

243. By collecting and storing this data, Defendants had a duty of care to use reasonable means to secure and safeguard it from unauthorized disclosure to third parties.

244. Defendants negligently failed to take reasonable steps to protect Plaintiffs' Children's and Class Members' Private Children's Data from being disclosed to third parties, without parental consent, including to Google and Microsoft.

245. Defendants further negligently omitted to inform Plaintiffs, Plaintiffs' Children, and Class Members that they would use the Private Children's Data for marketing purposes, or that the Private Children's Data would be transmitted to third parties.

246. Defendants knew, or reasonably should have known, that Plaintiffs' Children's and Class Members' would not have provided their Private Children's Data to Defendants, had Plaintiffs, Plaintiffs' Children, and Class Members known that Defendants intended to use that information for unlawful purposes.

247. Defendants' conduct has caused Plaintiffs' Children and Class Members to suffer damages by having their Private Children's Data accessed, stored, and disseminated without their knowledge or consent (or the knowledge or consent of their parents).

248. Plaintiffs, Plaintiffs' Children, and Class Members are entitled to compensatory, nominal, and/or punitive damages.

249. Defendants' negligent conduct is ongoing, in that it still holds the Private Children's Data of Plaintiffs' Children and Class Members in an unsafe and unsecure manner. Therefore, Plaintiffs Rodriguez and Rader, their Children, and Class Members who continue to use the Platform are also entitled to injunctive relief requiring Defendants to (i) strengthen their data security systems and monitoring procedures; (ii) submit to future annual audits of those systems and monitoring procedures; and (iii) provide adequate credit monitoring to all Class Members.

**COUNT VII**
**BREACH OF IMPLIED CONTRACT**
**(*On Behalf of Plaintiffs' Children and the Nationwide Class and, alternatively, the California, Illinois, New Jersey, and Indiana Subclasses*)**

250. Plaintiffs repeat and reallege the allegations contained in paragraphs 1 through 249 as if fully set forth herein.

251. When Plaintiffs' Children and Class Members provided their Private Children's Data to Defendants in exchange for services, they entered into an implied contract pursuant to which Defendants agreed to safeguard and not disclose their Private

Children's Data without consent.

252. Plaintiffs' Children and Class Members accepted Defendants' offers and provided their Private Children's Data to Defendants.

253. Plaintiffs, Plaintiffs' Children, and Class Members would not have entrusted Defendants with their child's Private Children's Data in the absence of an implied contract between them and Defendants obligating Defendants to not disclose the Private Children's Data without consent.

254. Defendants breached these implied contracts by disclosing Plaintiffs' Children's and Class Members' Private Children's Data to third parties like Google and Microsoft.

255. As a direct and proximate result of Defendants' breaches of these implied contracts, Plaintiffs' Children and Class Members sustained damages as alleged herein.

256. Plaintiffs' Children and Class Members would not have used Defendants' services had they known their Private Children's Data would be disclosed.

257. Plaintiffs, Plaintiffs' Children, and Class Members are entitled to compensatory, consequential, and/or nominal damages as a result of Defendants' breaches of implied contract.

**<u>COUNT VIII</u>**
**UNJUST ENRICHMENT**
***<u>(On Behalf of Plaintiffs' Children and the Nationwide Class and, alternatively, the California, Illinois, New Jersey, and Indiana Subclasses)</u>***

258. Plaintiffs repeat and reallege the allegations contained in paragraphs 1

through 257 as if fully set forth herein.

259. Plaintiffs plead this claim in the alternative to their breach of implied contract claim.

260. Plaintiffs' Children and Class Members conferred a monetary benefit on Defendants. Specifically, they provided their Private Children's Data to Defendants, which it exchanged for marketing and advertising services, as described, *supra*.

261. Defendants knew that Plaintiffs' Children and Class Members conferred a benefit which Defendants accepted. Defendants profited from the Private Children's Data belonging to Plaintiffs' Children and Class Members by exchanging it for marketing and advertising services.

262. In particular, Defendants enriched themselves by obtaining the inherent value of the Private Children's Data, and by saving the costs it reasonably should have expended on marketing and/or data security measures that would have secured the same from unauthorized disclosure.

263. Plaintiffs' Children and Class Members, on the other hand, suffered as a direct and proximate result of Defendants' decision to prioritize their own profits over the privacy of their Private Children's Data.

264. Under the principles of equity and good conscience, Defendants should not be permitted to retain the money belonging to Plaintiffs' Children and Class Members, obtained by their surreptitious collection and transmission of the Private Children's

Data.

265. If Plaintiffs, Plaintiffs' Children, and Class Members knew that Defendants had not reasonably secured their Private Children's Data, they would not have agreed to provide their, or their child's, Private Children's Data to Defendants.

266. Plaintiffs, Plaintiffs' Children, and Class Members have no adequate remedy at law for this count. An unjust enrichment theory provides the equitable disgorgement of profits even where an individual has not suffered a corresponding loss in the form of money damages.

267. As a direct and proximate result of Defendants' conduct, Plaintiffs, Plaintiffs' Children, and Class Members have suffered and will continue to suffer injury.

268. Defendants should be compelled to disgorge into a common fund or constructive trust, for the benefit of Plaintiffs, Plaintiffs' Children, and Class Members, proceeds that they unjustly received from them.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs, on behalf of themselves, Plaintiffs' Children, and the putative Class, pray for judgment against Defendants as follows:

A. an Order certifying the Nationwide Class and California, Illinois, and New Jersey Subclasses, and appointing the Plaintiffs and their Counsel to represent the Classes;

B. equitable relief enjoining Defendants from engaging in the wrongful conduct complained of herein pertaining to the misuse and/or disclosure of the Private Children's Data of Plaintiffs' Children and Class Members;

C. injunctive relief requested by Plaintiffs Rodriguez and Rader, including, but not limited to, injunctive and other equitable relief as is necessary to protect the interests of Plaintiffs, Plaintiffs' Children, and Class Members;

D. an award of all damages available at equity or law, including, but not limited to, actual, consequential, punitive, statutory and nominal damages, as allowed by law in an amount to be determined;

E. an award of attorney fees, costs, and litigation expenses, as allowed by law;

F. prejudgment interest on all amounts awarded and

G. all such other and further relief as this Court may deem just and proper.

**DEMAND FOR JURY TRIAL**

Plaintiffs, on behalf of Plaintiffs' Children and other members of the proposed Classes, hereby demand a jury trial on all issues so triable.

Dated: May 5, 2026

Respectfully submitted,

*/s/ Sonjay C. Singh*

Sonjay C. Singh (*pro hac vice*)
**SIRI & GLIMSTAD LLP**
400 East Pratt Street
8th Floor - #16946751
Baltimore, MD 21202
Tel: (212) 532-1091
E: ssingh@sirillp.com

Daniel Srourian, Esq. (SBN 285678)
**SROURIAN LAW FIRM, P.C.**
468 N. Camden Dr. Suite 200
Beverly Hills, CA 90210
Telephone: (213) 474-3800
Facsimile: (213) 471-4160
Email: daniel@slfla.com